Donaciano CARINO, Plaintiff-Appellee,

v.

The UNIVERSITY OF OKLAHOMA BOARD OF REGENTS, Defendants-Appellants.

No. 82–1152.

United States Court of Appeals, Tenth Circuit.

Dec. 17, 1984.

**816**

Stanley M. Ward, Kurt F. Ockershauser and Susan Gail Seamans of The University of Oklahoma, Norman, Okl., and Melvin F. Pierce, Oklahoma City, Okl., for defendants-appellants.

John Thomas Hall, Tulsa, Okl., for plaintiff-appellee.

Before SETH, Chief Judge, and McKAY and SEYMOUR, Circuit Judges.

McKAY, Circuit Judge.

This is an employment discrimination action. *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 (1982). Plaintiff, Mr. Carino, a naturalized citizen of the United States, was born in the Republic of the Phillipines. Prior to his employment with the defendants, Mr. Carino was a member of the United States Navy. As a result of Mr. Carino's national origin, he has a noticeable accent. Record, vol. 1, at 132.

Mr. Carino alleged before the trial court that the defendants had made employment decisions adverse to him solely because of his national origin. Specifically, he alleged that the defendants had discriminated against him in their employment practices because of his noticeable foreign accent. The trial court found that defendants had violated Title VII and awarded Mr. Carino back pay and attorney's fees and costs. In addition, the trial court ordered that defendants notify plaintiff of any vacant comparable positions in the defendants' employ. The defendants appeal.

*Background*

In 1974 Mr. Carino was hired by the defendants as supervisor of the dental laboratory at the University of Oklahoma College of Dentistry. At that time the laboratory staff consisted of Mr. Carino and one other technician. Mr. Carino's responsibilities included overseeing the supply and equipment of the lab, ensuring efficiency and high quality of work, contributing to the laboratory training of dental students, and performing complicated work in dental prosthetics and maxilliofacial technology. The trial court found that Mr. Carino's duties included a very minimum of supervision of other workers and that the defendants' primary motive in hiring Mr. Carino was to benefit from his technical skills rather than to use his supervisory skills. Record, vol. 1, at 133.

Shortly less than one year after Mr. Carino was hired, his job title was changed, without his knowledge, from dental laboratory supervisor to senior dental laboratory technician. His salary and responsibilities remained the same however. In the fall of 1975, subsequent to the change of Mr. Carino's title, Dr. Johnson and the Dean of the College of Dentistry began a search for new staff for the dental laboratory, which was in the process of expansion. Contrary to established university personnel procedures, the opening for supervisor—the position Mr. Carino thought he still held—was not publicized either within or without the university. Again, contrary to the univer-

sity policy that present employees be considered for new jobs, no one but Mr. Wimpy, who was eventually hired, was considered for the position. Mr. Carino was an active member of the group of persons who interviewed Mr. Wimpy for the position of supervisor. Record, vol. 1, at 134. Rumors circulated that Mr. Wimpy was being considered for the position of laboratory supervisor. However, Mr. Carino was told only that "Mr. Wimpy [was] being considered for a position in the production laboratory which supports the school [of Dentistry] clinic." *Id.* Despite the circulating rumors, Mr. Carino believed he still held the position of supervisor.

The new dental facility was completed in the spring of 1976 and in August Mr. Wimpy was hired as the dental laboratory supervisor. Mr. Wimpy began work in September and began to perform the functions previously performed by Mr. Carino. At about the same time Mr. Carino's job title was changed to senior maxilliofacial technician. This change was classified as a promotion and was accompanied by a salary increase. Mr. Carino, however, did not receive notice of his change in title. In addition, at the time Mr. Carino became the maxilliofacial technician, the dental college no longer employed a faculty member who required maxilliofacial products. Thus, with Mr. Wimpy performing the functions of supervisor and there no longer being any need for the functions that Mr. Carino was reclassified to perform, Mr. Carino was left performing general functions in the laboratory. After consulting with Dr. Johnson and the Dean of the College of Dentistry, Mr. Carino discovered that he had been replaced as supervisor of the laboratory. Mr. Carino pursued the matter further. The university conducted an investigation and concluded that there had been some "misunderstanding." On November 15, 1976, Mr. Carino learned, for the first time, of his prior job reclassifications. On March 1, 1977, Mr. Carino voluntarily changed his employment status from full-time to half-time and devoted his time to his private commercial laboratory in the garage of his home.

Over a month later Mr. Carino was officially terminated by the university. Mr. Carino's failure to perform an assigned task which he believed to be illegal was the predicate to his official termination. Mr. Carino filed a complaint with the EEOC alleging discrimination in the reclassification and termination decisions. After an investigation, the EEOC concluded that there was reasonable cause to believe that Mr. Carino's national origin was a factor in the personnel decisions which adversely affected him.

### The Trial Court Opinion

In the trial court Mr. Carino did not allege that the termination decision was unlawful. Rather, he alleged only that his job reclassifications were discriminatory and that the sudden, demeaning shifts in his employment status constituted a constructive discharge.

Acknowledging that there are employment practices which are distasteful but fail to come within the sphere of Title VII provisions, *see Garcia v. Gloor*, 618 F.2d 264, 268 (5th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981), the trial court concluded that Mr. Carino was demoted from supervisor in the old laboratory and denied the opportunity to be considered for supervisor in the new laboratory because of his Phillipine origin, but that defendants' ultimate termination of Mr. Carino, absent a finding of constructive discharge, was not in violation of Title VII. The court found that since there was no scheme to make conditions such that Mr. Carino would resign, *see Muller v. U.S. Steel Corp.*, 509 F.2d 923, 929 (10th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975), there was no constructive discharge. The court concluded that "[i]n the absence of a constructive discharge in violation of Title VII, the plaintiff's recovery is limited to damages suffered prior to the time of his termination for refusal to perform assigned work."

Defendants ask us to review the trial court's finding of disparate treatment.

Specifically, the defendants first challenge the trial court's conclusion that Mr. Carino established a prima facie case of discrimination.

## The Prima Facie Case

In enacting Title VII, Congress sought to assure equality of employment opportunity by prohibiting employers from making employment decisions that adversely affect an employee or applicant because of that individual's race, color, religion, sex or national origin. 42 U.S.C. § 2000e–2(a) (1982).

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the Supreme Court held that the plaintiff in a Title VII case has the initial burden of establishing a prima facie case of discrimination. A plaintiff satisfies that burden by showing that:

(1) he or she belongs to the protected class;

(2) he or she applied and was qualified for the position;

(3) despite such qualifications, he or she was rejected; and

(4) after his or her rejection, the position remained open and the employer continued to seek similarly qualified applicants. *Id.*

The rationale for requiring plaintiff to carry this initial burden is to eliminate "the most common nondiscriminatory reasons for the plaintiff's rejection," and to raise the inference of discrimination, since acts which meet the four-pronged test " 'are more likely than not based on the consideration of impermissible factors.' " *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981) (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577). Both the language of Title VII and the case law interpreting the statute require that any test tailored to aid in discerning violations of Title VII be flexible. *Carlile v. South Routt School District*, 739 F.2d 1496, 1499 (10th Cir.1984).

In adopting the *McDonnell Douglas* test the trial court held that:

The plaintiff has met his burden of establishing a prima facie case of dis-

crimination on the basis of national origin by establishing that:

(1) the plaintiff's national origin is the Republic of the Phillipines;

(2) the plaintiff was qualified for the job of supervisor in the old dental laboratory and the new dental laboratory;

(3) despite the plaintiff's qualifications, he was reassigned from the supervisory position to a staff position in the old dental laboratory and was not afforded an opportunity to be considered for the supervisory position in the new dental laboratory; and

(4) after the plaintiff was demoted and denied the opportunity to apply for the new supervisory position, a party not subject to a similar national origin was hired for the position.

Record, vol. 1, at 139. We see no error in the trial court's application of the prima facie test to the facts and circumstances of this case.

On appeal defendants complain that Mr. Carino failed to meet the third prong of the test because he failed to prove that he applied for the job of supervisor of the new dental laboratory. The evidence supports the trial court's finding on this point. The court found that, because Mr. Carino was led to believe he was still the supervisor, he was precluded from applying for the job of supervisor. This is sufficient support for the trial court's conclusion that but for discrimination he would have applied for the job.

## Disparate Treatment Analysis

Defendants next object to the trial court's finding of disparate treatment. Disparate treatment exists when "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical ..." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). *See Firefighters Incorporated for Racial Equality v. Bach*, 731 F.2d 664, 666–67 (10th Cir.1984).

The defendants claim the trial court made conflicting findings: that there was disparate treatment and that there was no intent to discriminate. The trial court's only finding of lack of intent related to plaintiff's constructive discharge claim. The court found no evidence of a scheme to cause plaintiff to quit. Record, vol. 1, at 145. The court expressly found intent to discriminate with respect to the demotion and the withholding of the supervisor position however. Record, vol. 1, at 142. The finding that the defendants did not engage in a scheme to force Mr. Carino's departure does not conflict with the trial court's finding that their decision to demote Mr. Carino from laboratory supervisor and the failure to consider him for supervisor in the new laboratory was the result of discriminatory intent. The trial court found:

1. the decision to demote the Plaintiff from the supervisory position in the old . laboratory was made on the basis of his national origin and related accent, and that this decision violated the rights of the Plaintiff under the provisions of Title VII.

Record, vol. 1, at 12, and

2. [the] failures [to properly inform Mr. Carino that he had been removed from the supervisory position, and that other persons were being considered for the job of supervisor which Mr. Carino still believed he held and the duties for which he had continued to perform] on the part of the defendants were all interwoven with and caused by the discriminatory and improper presumptions on the part of certain dental college faculty that the Plaintiff could not perform all supervisory duties because of his national origin and related accent.

*Id.* These findings support the court's conclusion that Mr. Carino successfully established discriminatory intent.

Once the plaintiff establishes a prima facie case the burden shifts to the employer to show that the employment decision was based on a legitimate interest rather than on illegitimate considerations such as race, religion or national origin.

*Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). The employer need only "articulate some legitimate nondiscriminatory reason for the employee's rejection," *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824, in order for the burden to shift back to the employee to prove that the legitimate justification was actually a mere pretext for discrimination. *Id.* at 804, 93 S.Ct. at 1825.

The defendants assert that the plaintiff was "demoted" because he was hired for his technical skills and was given the supervisor title in the first place only to increase his salary. Record, vol. 1, at 140. The court found this proffered reason to be a pretext. There is sufficient evidence in the record to support the court's conclusion that, although plaintiff was not hired primarily for his supervisory skills, the demotion resulted from the opinion held by certain dental college faculty that the plaintiff was unsuitable to continue as supervisor because of his national origin and related accent. A foreign accent that does not interfere with a Title VII claimant's ability to perform duties of the position he has been denied is not a legitimate justification for adverse employment decisions. *Cf. Salem v. La Salle High School,* (No. 82–01310–BR, C.D.Cal. March 31, 1983) (language difficulties that interfere with performance of duties may be legitimately considered in employment decisions). The court found that plaintiff's accent would not interfere with the duties required of a supervisor.

The defendants further allege that the trial court erroneously placed the burden on them to show that plaintiff would have been unqualified to serve as supervisor of the expanded dental laboratory or to prove that Mr. Wimpy was better qualified than Mr. Carino. The trial court found that "[t]here was no proof that the Plaintiff could not perform any of the tasks required of the supervisor of the new dental laboratory." Although this finding could, in a vacuum, be construed as shifting the burden of proof on this issue to defendants,

it is clear that it did not, in view of the fact that the defendants conceded in the trial court that plaintiff was qualified for the position and would have been recommended for the job had he applied.

## Factual Finding

The defendants challenge the trial court's factual finding that Mr. Carino's accent was a significant factor in defendants' decisions regarding Mr. Carino's employment. Factual determinations in Title VII cases are to be treated no differently than any other factual finding by the trial court. *Pullman-Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). Thus, the trial court's finding of fact regarding the significance and presence of Mr. Carino's accent, not being clearly erroneous, will not be reversed.

## Damages and Attorney's Fees

Lastly, defendants object to the trial court's determination of damages and award of attorney's fees to the plaintiff. The remedy of back pay in a Title VII case is within the discretion of the trial court. *Taylor v. Safeway Stores, Inc.,* 524 F.2d 263, 267 (10th Cir.1975). The trial court awarded Mr. Carino the difference in *full-time* pay between the position he was assigned, maxilliofacial technician, and the position of supervisor in the new dental laboratory, from the date the supervisor position in the new laboratory was filled until the time Mr. Carino was terminated. The court might reasonably have concluded that had Mr. Carino not been wrongfully denied the supervisor position, he would have continued his full-time employment with the University. Thus, even though defendants did not intend to force the plaintiff's switch to half-time status, it may well have resulted from his being "resigned to performing general functions in the laboratory" and have been directly caused by defendants' discriminatory employment practices. The evidence supports the trial court's award of damages.

This court has carefully read the briefs and thoroughly reviewed the record on appeal. The decision of the trial court is in all aspects AFFIRMED.