**James J. SHIEH, PhD.**

v.

**Richard E. LYNG, Secretary, Department of Agriculture.**

Civ. A. No. 88–0303.

United States District Court, E.D. Pennsylvania.

April 4, 1989.

Gerald Wallerstein, Philadelphia, Pa., June D.W. Kalijarvi, George M. Chuzi (pro hac vice), and Margie A. Slusher (pro hac vice), Kalijarvi & Chuzi, P.C., Washington, D.C., for James J. Shieh.

Robert J. Smolkski, Asst. U.S. Atty., for Richard E. Lyng.

## ADJUDICATION

VAN ANTWERPEN, District Judge.

Plaintiff, James T. Shieh, filed this suit on January 15, 1988 against Richard E. Lyng, Secretary of the United States Department of Agriculture ("USDA" or "agency"), alleging discrimination on the basis of his race (Asian) and national origin (Taiwanese) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16. Plaintiff also appeals from an unfavorable action of the Merit Systems Protection Board ("MSPB") under the Civil Service Reform Act of 1978, 5 U.S.C. § 7703, claiming that the agency abused its discretion in reducing him in grade and that there is no substantial evidence supporting the agency's actions.

▮ This court has jurisdiction over plaintiff's claims pursuant to 42 U.S.C. § 2000e–5(f)(3) and 5 U.S.C. § 7702(a)(3). Because this matter is considered a "mixed case," in that the adverse action is challenged on both discriminatory and nondiscriminatory grounds, this Court is designated to hear the claims. 5 U.S.C. § 7703(b)(2); *Rias v. Walters*, No. 84–5427, 1986 WL 9170 (E.D.Pa. Aug. 19, 1986) (LEXIS, Genfed Library, Dist file). We hear the claims of discrimination under 42 U.S.C. § 2000e de novo, *see id.*, and we hear the appeal from the MSPB on a standard requiring proof that the action was (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c); *Parker v. U.S. Postal Service*, 819 F.2d 1113 (Fed.Cir.1987). From the non-jury trial held on February 27, 1989 through March 2, 1989, we make the following findings of fact.

## FINDINGS OF FACT

1. Plaintiff James J. Shieh is an Asian male who was born in Taiwan in 1941. He obtained a B.S. degree in Agricultural Chemistry from National Taiwan University in 1964. He came to the United States in a fellowship program for a Ph.D. at the University of Utah when he was 26 years old. Plaintiff became an American citizen in 1976 and presently resides in Pennsylvania.

2. Plaintiff obtained his Ph.D. in 1972 and presently is an employee of the United States Department of Agriculture ("USDA") and has worked at the USDA Eastern Regional Research Center ("ERRC") offices located at 600 East Mermaid Lane, Philadelphia, Pennsylvania, since August, 1981.

3. Prior to plaintiff's employment with the USDA, he worked as an associate investigator in the Chemistry Department of Boston University from 1976 through 1980, and as a research chemist with the United States Army Research and Development Laboratory in Natick, Massachusetts, from 1980 through August, 1981. At Natick, he worked with a Dr. Wierbicki until Dr. Wierbicki went to work for the USDA.

4. In August, 1981, plaintiff began work at the USDA ERRC as a research scientist, GS–12, working in the Food Safety Laboratory as a research chemist. Part of the work of the ERRC laboratory consists of doing research and publishing the results in a number of journals.

5. Scientists in grade GS–12 are classified as either Category 1 or Category 3. Category 1 scientists are required, among other things, to conceive and carry out research and write manuscripts under general supervision, whereas Category 3 scientists do not have to conceive research projects, define their objects, or produce final manuscripts in publishable form. Category 1 scientists are expected to senior author one published paper or co-author at least two papers each year. Category 3 scientists fulfill a support role, and are not expected to publish manuscripts. Within Category 3, GS–12 scientists are expected to display more leadership ability than GS–9 scientists. Before his demotion, plaintiff was serving as a Category 1, GS–12 scientist.

6. In 1983, plaintiff and eight or ten persons, including others from his group, received training on a measuring device called the Electron Spin Resonator ("ESR"). Plaintiff did ESR work at the laboratory in addition to his other work. He was also trained on the Cesium 130 Radiation Source.

7. Although others had training, he was the only one in the Center who operated the ESR equipment. Dr. Wierbicki did not object to this. He spent about ten hours a week operating the ESR equipment and ten hours a week operating the radiation source.

8. Plaintiff's initial first level (immediate) supervisor at ERRC was Dr. Eugene Wierbicki, a Supervisory Research Food Technologist. Dr. Wierbicki had previously worked with plaintiff and had suggested that the ERRC hire him. Plaintiff's second level supervisor at that time was Dr. Donald Thayer. At that time, Dr. Wierbicki consistently gave plaintiff "fully satisfactory" ratings and Dr. Thayer concurred with these ratings. He also noted in writing that plaintiff had to spend much time working with ESR and the radiation source equipment.

9. On May 12, 1985, the ERRC reassigned Dr. Wierbicki was reassigned to a non-supervisory position in which he would concentrate on scientific and research areas. Following Dr. Wierbicki's reassignment, Dr. Thayer became plaintiff's immediate (first level) supervisor.

10. Problems arose between Dr. Thayer and the plaintiff concerning plaintiff's ability to prepare written manuscripts. Specifically, plaintiff had difficulty both defining a written hypothesis which clearly and concisely stated the object of his research and providing a data base for his work. Papers authored by plaintiff and reviewed by Dr. Thayer bear multiple written mark-ups, suggestions, and changes.

11. In 1984, a USDA Peer Panel reviewed plaintiff and concluded that his position was proper but the panel also expressed concern with plaintiff's lack of documentation of research efforts in his scientific literature.

12. In September, 1985, plaintiff received a job performance appraisal for the rating period of September 4, 1984 through September 2, 1985. Plaintiff's performance appraisal included two critical elements: performing investigations and dissemination of results. Plaintiff received a less than acceptable rating overall and on one of the critical elements.

13. Under USDA policies and procedures, a "critical element" is a component of an employee's job which is of sufficient importance that performance below the minimal standard established by management requires remedial action and denial of a within-grade increase, and may be the basis for removing or reducing the grade level of the employee.

14. On September 12, 1985, Dr. Thayer discussed with plaintiff the performance objectives and requirements for plaintiff's position as research chemist GS–12. Dr. Thayer assigned a total of five elements. At that time, Dr. Thayer designated only

element one ("conceives, defines and plans research proposals") as a critical element.

15. As part of his performance requirements for the September 1985—September 1986 appraisal period, Dr. Thayer required plaintiff to prepare two research proposals by November 1, 1985: (1) a proposal emphasizing the effects of low dose irradiation on proteins; and (2) a proposal emphasizing the effects of low dose irradiation on lipids of poultry. During this period, Dr. Thayer also required plaintiff to complete and submit a paper on the thiamine degradation in bacon and on the analysis of Allied dosimeters.

16. On January 28, 1986, Dr. Thayer notified plaintiff that the two proposals on irradiation on proteins and irradiation on lipids of poultry, due to be submitted on November 1, 1985, were now overdue. Dr. Thayer gave plaintiff until February 10, 1986 to submit the first proposal and until March 10, 1986 to submit the second proposal. Dr. Thayer reminded plaintiff that timely completion of these proposals represented a critical element in plaintiff's performance evaluation.

17. Submission deadlines are sometimes used for problem employees in USDA, although they also arise in other situations. The deadlines established in the January 28, 1986 meeting were set forth in a memo to plaintiff from Dr. Thayer. The memo also confirmed that plaintiff was to set aside "all but the most essential laboratory or other work" to comply with his deadlines (Govt. Exhibit #9).

18. On February 20, 1986, the USDA Labor and Employee Relations Branch informed Dr. Thayer in a memo (Govt. Exhibit #11) that plaintiff appeared to be having a performance problem and that plaintiff should be advised that his within-grade increase would not be granted unless his performance improved to an acceptable level.

19. On February 27, 1986, Dr. Thayer met with plaintiff and discussed plaintiff's performance evaluation. Dr. Thayer explained to plaintiff why his performance was considered unsatisfactory: plaintiff failed to submit the two required research proposals and two required manuscripts on the degradation of thiamin in bacon and the Allied dosimeter study. Dr. Thayer explained what plaintiff should do to document his research and imposed a deadline of March 10, 1986 for the research proposals, April 10, 1986 for a manuscript on the irradiation of spices, and May 30, 1986 for a manuscript on the Allied dosimeters. Plaintiff did not indicate at this time that he would have any problem in meeting these deadlines.

20. The February 27, 1986 meeting was outlined in a memo (Govt. Exhibit #13) dated March 6, 1986, which Dr. Thayer gave to plaintiff and which plaintiff acknowledged. The memo required that plaintiff "set aside all, but the most essential laboratory or other work" until the work on the manuscripts was done. Plaintiff testified he stopped all other work except dosimeter work and projects with two universities.

21. On March 3, 1986 and March 21, 1986, plaintiff submitted draft proposals on the irradiation of proteins to Dr. Thayer which he found to be vague and poorly proposed. Dr. Thayer returned the proposals to plaintiff with his comments.

22. On April 29, 1986, Dr. Thayer informed plaintiff that his draft manuscript on the irradiation of spices was overdue and that he had not received the required draft on the Allied dosimeters. Dr. Thayer then required that plaintiff submit both studies to him by May 12, 1986. He set this forth in a memo (Govt. Exhibit #15) and sent it to plaintiff, who at that time offered no excuse for his performance.

23. On May 22, 1986, plaintiff provided Dr. Thayer with a program abstract for the Allied dosimeter. Dr. Thayer informed plaintiff that he found significant deficiencies in the abstract.

24. On June 9, 1986, Dr. Thayer returned plaintiff's revised abstract approval for the Allied dosimeter study, finding a number of defects in the abstract. That same day, plaintiff's performance standards were revised to reflect the conver-

sion of element four ("Dissemination of Results") to a critical element.

25. On June 9, 1986, Dr. Thayer met with plaintiff and informed him that he was in jeopardy of receiving unacceptable ratings for the two critical elements in plaintiff's performances standards. Dr. Thayer further informed plaintiff that he was being put on a 90–day Performance Improvement Period ("PIP") to monitor plaintiff's progress and to give him the opportunity to correct the performance deficiencies. Dr. Thayer said this was set forth in a memo (Govt. Exhibit # 19) and sent it to plaintiff.

26. The PIP was to run from June 9 to September 9, 1986. Plaintiff was informed that failure to achieve an acceptable rating would result in either termination or demotion from a Category 1 to a Category 3 scientist.

27. During the PIP, Dr. Thayer assigned plaintiff new deadlines to produce the proposals and manuscripts for which he had been given earlier deadlines. Specifically, plaintiff was required to submit: (1) by June 23, 1986, a proposal on the effects of low dose irradiation on proteins of red meat or poultry; (2) by July 7, 1986, a proposal on the effects of low dose irradiation on lipids of poultry; (3) by August 11, 1986, a final draft of a manuscript on the irradiation on spices; and (4) by August 25, 1986, a final manuscript on the Allied dosimeters.

28. During July, 1986, plaintiff submitted separate proposals on the effects of irradiation on proteins of red meat and poultry and irradiation on lipids of poultry. Dr. Thayer returned both of these to plaintiff with extensive comments concerning deficiencies in both proposals.

29. On September 29, 1986, plaintiff resubmitted an abstract on the irradiation of meats and poultry and a handwritten abstract of the Allied dosimeter study. Dr. Thayer found both submittals insufficient.

30. On September 30, 1986, plaintiff was denied a within-grade increase based on his unacceptable level of performance.

31. On October 8, 1986, Dr. Thayer evaluated plaintiff's performance during the designated PIP. Dr. Thayer concluded that plaintiff failed to meet the assigned due dates and that he showed no improvement during the PIP. Specifically, Dr. Thayer noted that plaintiff's two proposals were unacceptable as submitted, that the manuscript on irradiation on spices was not ready for publication without major revision, and that the draft manuscript on the Allied dosimeter studies was deficient. Dr. Thayer concluded that he could not rate plaintiff's performance in his two critical elements as satisfactory. Dr. Thayer expressed this in a memo and sent it to plaintiff (Govt. Exhibit # 26).

32. On October 8, 1986, Dr. Thayer also evaluated plaintiff's performance for the September 1985—September 1986 appraisal year. Dr. Thayer gave plaintiff an unacceptable rating both overall and in plaintiff's two critical elements. Dr. John Cherry, plaintiff's "higher level" supervisor and Director of ERRC, concurred in the evaluation. Dr. Cherry has made his own independent objective reviews of plaintiff's work.

33. On October 14, 1986, Dr. Thayer and Dr. Cherry discussed the matter with the USDA personnel office and they considered either doing nothing or terminating plaintiff's employment. They concluded that doing nothing was in conflict with the PIP and termination was too extreme. They also considered downgrading plaintiff to the highest position plaintiff could fill. After the discussions, Dr. Thayer and Dr. Cherry recommended, in writing, to the USDA personnel office that plaintiff's position be downgraded to a GS-9 research scientist position at ERRC.

34. On February 4, 1987, Dr. Thayer again told plaintiff to give priority to plaintiff's work on the Allied dosimeter study and to "cease all other work." He required plaintiff to produce a draft manuscript suitable for internal review by March 2, 1987. He expressed this in a memo which was given to plaintiff (Govt. Exhibit # 28). Plaintiff did not submit any manuscript to Dr. Thayer by the March 2, 1987 deadline or after it.

35. On April 29, 1987, plaintiff received notice from the USDA Labor and Employee Relations Branch of the Department's proposal to reduce him in grade to a GS–9 chemist. The notice indicated that the agency based its decision on plaintiff's unacceptable performance rating in his two critical elements.

36. On May 5, 1987, Dr. Thayer brought to the attention of the Employee Relations Branch of the USDA certain documents which appeared to indicate that plaintiff engaged in unauthorized use of radioactive tracers. We will disregard this incident because no charges were brought, and the agency took no action concerning this information.

37. Effective July 20, 1987, for reasons stated in the April 29, 1987 notice, the USDA reduced plaintiff's job classification from a GS–12 Research Chemist to a GS–9 Chemist. This made plaintiff the only person at the laboratory holding a Ph.D. who was in grade GS–9.

38. Plaintiff's reduction in grade was based on his failure to complete proposals and manuscripts in publishable form and his unacceptable performance in disseminating the results of his research. Such performance was the result of difficulties with oral and written expression, in fixing limited objectives, in setting priorities, and in operating in an organized manner. Although willful misconduct is not involved in any way, plaintiff's problems are real and substantial.

39. There is a USDA policy against transferring problem employees from one supervisor to another. At the same time, when managers and employees have difficulties in working together because they are mismatched, either the manager or employee may request reassignment to another supervisor if a position is available. In the instant case neither Dr. Thayer nor plaintiff made such a request.

40. Neither Dr. Thayer nor anyone else in the agency considered plaintiff's race or national origin in deciding to reduce plaintiff in grade. There was clearly a mismatch between plaintiff and Dr. Thayer; nevertheless, it is also objectively clear that the agency based its reduction in grade on its good faith judgment that plaintiff had not performed at a minimally acceptable standard in his Category 1 position with the ERRC.

41. Since the demotion, plaintiff has performed and continues to perform successfully in rheology which involves the elastic behavior of certain foods. Plaintiff does adequate scientific research when others work closely with him, set project objectives and assist him in writing manuscripts.

42. The USDA demoted plaintiff in accordance with USDA Directive 418.3 and Department personnel directives on performance appraisals.

43. Plaintiff appealed the USDA decision to The Merit Systems Protection Board, and in an opinion dated November 13, 1987, finding no evidence of discrimination and no abuse of discretion, the MSPB affirmed the agency's demotion.

## DISCUSSION

 Title VII of the Civil Rights Act of 1964, as amended in 1972, provides that

> all personnel actions affecting employees … in executive agencies as defined in section 105 of Title 5 … shall be made free from any discrimination based on race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–16(a).[1]

In order to prevail on a Title VII claim, the plaintiff must prove that the defendant intentionally discriminated against him. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). The plaintiff need not, however, produce direct evidence of discrimination. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983). Instead, the Supreme Court has developed a framework

---

1. The Department of Agriculture is an executive department pursuant to 5 U.S.C. § 105. Under Title VII, the Secretary of Agriculture, as the head of the agency, is the appropriately named defendant. 42 U.S.C. § 2000e–16(c).

governing the order and allocation of proof in circumstantial cases of discrimination. *See McDonell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). The plaintiff bears the initial burden of establishing a *prima facie* case. The nature of the required showing depends on the circumstances of the case. *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13. In this case, plaintiff must show (1) that he is a member of a protected class; (2) that he is qualified for his position; and (3) that despite his qualifications, defendant demoted him while treating others not in the protected class more favorably. *See Massarsky v. General Motors Corp.*, 706 F.2d 111, 118 (3d Cir.), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). By establishing a prima facie case, the Title VII plaintiff creates a "rebuttable 'presumption that the employer discriminated against him.'" *Aikens*, 460 U.S. at 714, 103 S.Ct. at 1481 (quoting *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094). To rebut this presumption, the defendant must produce evidence that defendant demoted plaintiff for a legitimate, non-discriminatory reason. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. The employer need not persuade the court that it was motivated by a non-discriminatory reason. "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094. If the defendant carries its burden of production, it has effectively rebutted the presumption raised by the prima facie case, and the burden of persuasion shifts to the plaintiff. The plaintiff must then show that the defendant's proffered reason was not the true reason for the demotion, but that it was merely pretextual. *Id.* at 256, 101 S.Ct. at 1095. To do so, the plaintiff must either persuade the court that it is more likely that the discriminatory reason motivated the employer or that the employer's proffered explanation is not credible. *Id.* The plaintiff need not show that the discriminatory reason was *the* determinative factor, but only that it was *a* determinative factor. *Bellissimo v. Westinghouse Electric Corp.*, 764 F.2d 175 (3d Cir.1985), *cert.*

*denied*, 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986).

Although we have doubts, we will assume for the moment that plaintiff has met his modest burden of establishing a *prima facie* case of race and national origin discrimination. First, he has shown that as a native of Taiwan he is a member of a protected class. Second, we will assume that he has shown that he was qualified for his position: despite substantial evidence that plaintiff did not perform his job satisfactorily, in 1984, the USDA Peer Panel gave him a satisfactory review and at trial some witnesses testified to his at least minimally satisfactory performance level. Third, plaintiff has shown that other scientists, who were not members of the protected class, who had difficulty performing the duties of a Category 1 scientist became Category 3 scientists without a reduction in grade. This may be sufficient to show that defendant treated other similarly situated non-protected class employees more favorably.

█ Assuming plaintiff has met his initial burden, defendant has articulated legitimate, non-discriminatory reasons for demoting plaintiff. Both Dr. Thayer and Dr. Cherry testified as to plaintiffs unacceptable performance at the Category 1 level. Category 1 scientists are expected to senior author at least one paper a year or co-author at least two papers. The evidence showed that plaintiff had serious difficulties successfully preparing written manuscripts. Specifically, plaintiff did not clearly articulate his hypotheses and did not adequately support his conclusions with data. Under *Burdine*, these reasons for demotion are sufficient to rebut the presumption that defendant discriminated against plaintiff.

█ Plaintiff argues that the proffered reasons are simply pretextual. Plaintiff asserts that defendant demoted plaintiff because of his race, and more specifically in response to his difficulties with the English language. Plaintiff argues that such language considerations constitute discriminatory and illegitimate bases for punitive action. In support of this position,

plaintiff cites several cases and regulatory authority. In 1980, the Equal Opportunity Commission ("EEOC") promulgated regulations defining national origin discrimination. The regulations provide that discrimination includes the denial of equal employment opportunity because of an individual's place of origin or "because an individual has the physical, cultural or linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1 (1987). Furthermore, the EEOC has targeted for particular scrutiny "[f]luency-in-English requirements, such as denying employment opportunities because of an individual's foreign accent, or inability to communicate well in English." 29 C.F.R. § 1606.6(b)(1). Plaintiff concedes that there are some positions for which the ability to communicate effectively is a legitimate consideration. Thus, plaintiff notes that courts have upheld an employer's reliance on language ability in cases involving teaching positions, *See Hou v. Commonwealth of Pennsylvania Department of Education,* 573 F.Supp. 1539, 1547 (W.D.Pa.1983) (held that teaching effectiveness includes ability to communicate the content of a discipline), positions requiring contact with the public, *See Mejia v. New York Sheraton Hotel,* 459 F.Supp. 375 (S.D.N.Y.1978), *modified,* 476 F.Supp. 1068 (S.D.N.Y.1979) (hotel desk clerk), and positions involving health and safety, *See Garcia v. Rush–Presbyterian–St. Luke's Medical Center,* 660 F.2d 1217 (7th Cir.1981) (hospital positions require effective communication skills). Plaintiff also cites to cases in which courts found discrimination where defendants demoted plaintiffs for language disabilities. In *Carino v. University of Oklahoma Board of Regents,* 750 F.2d 815 (10th Cir.1984), the court held that the defendant discriminated against a dental laboratory supervisor who had difficulties with the English language. The court wrote, "[a] foreign accent that does not interfere with a Title VII claimant's ability to perform duties of the position he has been denied is not a legitimate justification for adverse employment decisions." *Id.* at 819. Similarly, in *Kyriazi v. Western Electric Co.,* 461 F.Supp. 894 (D.N.J.1978), *aff'd*

*on other grounds,* 647 F.2d 388 (3d Cir. 1981), the court held that the defendant discriminated against the plaintiff engineer from Greece who spoke with an accent and was at times difficult to understand. The court found that in light of her significant prior achievements and glowing endorsements from subsequent supervisors, the defendant's justification for taking action against her was pretextual. *Id.* at 925. We find that plaintiff's case more properly falls in the category of those cases in which communication skills were necessary to successful performance of the job. Unlike the plaintiff in *Carino* and in *Kyriazi,* Dr. Shieh was responsible for producing written work in areas of significant complexity and abstraction.

One of the central requirements of plaintiff's Category 1 position is that he publish scientific manuscripts. Defendant demoted plaintiff for his failures in the publication process. As discussed above, in his drafts, plaintiff did not formulate his hypotheses clearly and he did not provide adequate support for his positions. To some extent, it is likely that his poor communication skills resulted in his publication difficulties. In addition, the testimony also suggests that plaintiff had difficulty organizing his work and providing sufficient data and interpretation to support his hypotheses. If defendants demoted plaintiff because he had discrete, limited, and remediable problems with writing such that editing would alleviate the deficiencies of his work, we would conclude that to the extent that his communication skills led to his downfall at the center, defendants discriminated against him. However, we find that his communication problems cut much deeper than that. As a Category 1 scientist, plaintiff was required to formulate abstract concepts, develop a hypothesis, develop methods to test that hypothesis, and follow up with experimentation, documentation, and ultimately produce a coherent, publishable manuscript. Plaintiff was unable to successfully do any of those things. Defendants gave him ample opportunity to improve his performance: Dr. Thayer told

him that he could take a writing course[2]; Dr. Thayer met with him on several occasions to discuss his problems; and Dr. Thayer extended plaintiff's deadlines to give him more time to complete his projects. In spite of that, plaintiff could not produce satisfactory work. It is obvious that a certain level of communication skills are necessary for publishing manuscripts, and that plaintiff's weaknesses with the English language may have contributed to his difficulties; but because plaintiff's difficulties went beyond mere superficial discomfort with the English language, and because effective communication skills are indispensable to successful writing, we do not find that defendant discriminated against plaintiff. The problem was not that plaintiff was an Asian; plaintiff simply could not perform Category 1 work.

■ Plaintiff also argues that because there are no other Ph.D.'s at a GS–9 level, such evidence suggests that the agency treated plaintiff disparately. Plaintiff cites to other instances where Category 1, GS–12 scientists became Category 3 scientists while retaining their GS–12 level. Plaintiff has failed to show, however, that any of these scientists were similarly situated to plaintiff. Plaintiff has not shown that any of them were having serious difficulties which resulted in a probationary period or further, that any of them failed probation. Moreover, the number of cases plaintiff cites are statistically insignificant. The mere fact that four or five scientists became Category 3 scientists without a reduction in grade, taken alone, is not sufficient to show illegal disparate treatment.

■ Plaintiff urges the Court to consider the testimony of Dr. Silbert, Dr. Irwin, and Dr. Benedict for the proposition that while plaintiff had some problems with his work, his deficiencies were typical and thus should not have resulted in demotion. We concede that these witnesses presented testimony somewhat supportive of the plain-

tiff's position. But we do not find that their testimony sufficiently contradicted the conclusions of Dr. Thayer and Dr. Cherry. Dr. Silbert testified that he thought plaintiff was good enough to be a Category 1 scientist, and that he thought the protein and spice papers were adequate. On cross examination, however, Dr. Silbert admitted that he felt plaintiff worked better under supervision. Dr. Irwin found plaintiff's spice paper average, and acceptable with major revision. On cross examination, however, Dr. Irwin testified that he recognized problems with the focus of the protein paper, that on another paper plaintiff demonstrated a material and method problem, and that plaintiff took an extremely long time with his protein draft. Furthermore, Dr. Irwin admitted that he very rarely considers a paper unacceptable. Dr. Benedict testified that plaintiff's spice paper was average and that his bacon paper needed tightening.

The difficulty with our inquiry is that we are reviewing significantly subjective decisions. Dr. Thayer and Dr. Cherry found that plaintiff's work was not adequate while others found his work at least minimally acceptable. We must not and can not determine whose perspective on plaintiff's work is absolutely correct. Rather, we must determine whether there is substantial evidence to support the agency decision. The testimony of plaintiff's witnesses simply does not refute Dr. Thayer's and Dr. Cherry's conclusions. All the witnesses admitted to problems with plaintiff's work, and although they may have handled plaintiff's case differently, their testimony does not suggest that the agency decision was not supported by substantial evidence.

While we understand that plaintiff is not required to present direct evidence of discrimination, we note that testimony suggests that Dr. Thayer does not discriminate against Asians. All the witnesses testified that they never heard Dr. Thayer refer

---

**2.** Plaintiff argues that because Dr. Thayer did not direct plaintiff to specific courses, his advice in that area was not sufficient. We find not only that more specific direction was unneces-

sary, but the fact that plaintiff would demand such guidance is further evidence of his lack of independence and leadership ability.

derogatorily to Asians, and many explained that Dr. Thayer has supervised other Asians without incident. In one case, Dr. Thayer helped an Asian who was struggling with her graduate work successfully attain her Ph.D. We also note that Dr. Thayer played a positive role in hiring plaintiff and supported plaintiff in his 1984 peer review. If Dr. Thayer had a problem with Asians, it is likely that his antagonism would have materialized at an earlier stage. In addition, the evidence demonstrates that there are other Asians performing successfully in the agency and that there is no visible pattern of discriminatory treatment. Thus, for the reasons adduced above, plaintiff has not met his burden of proving discrimination.

 Under 5 U.S.C. § 7703, on appeal from the MSPB, we must also consider whether the agency made its decision to demote plaintiff arbitrarily, capriciously, or without substantial supporting evidence. While we may not have reached the same conclusion as the agency in demoting plaintiff to a Grade GS–9, we may not substitute our judgment for that of the agency. Plaintiff argues that the agency abused its discretion in demoting him because other employees with problems producing Category 1 work retained their GS–12 status while transferring to Category 3. We do not find the evidence as conclusive as plaintiff suggests. As discussed above, plaintiff has not shown that the agency treated other *similarly situated* employees disparately. Plaintiff has shown only that some scientists transferred from Category 1 to Category 3 without a reduction in grade. Furthermore, even if the agency did treat employees with performance problems differently, that would not in itself constitute an abuse of discretion. A comparison of other penalties employed by an agency is only one of the factors relevant in reviewing a given penalty. *Krauthamer v. Block,* 587 F.Supp. 254, 258 (S.D.N.Y.1984). In the instant matter, as outlined above, there was substantial evidence to justify the demotion.

Plaintiff argues that even if some action should have been taken against him, the agency should not have so severely reduced his grade. While we may agree that he was treated harshly, we can not find that the agency abused its discretion. We give deference to the agency's judgment unless the penalty exceeds the range of reasonable action. *Weiss v. United States Postal Service,* 700 F.2d 754, 758 (1st Cir. 1983); *See also Debose v. United States Department of Agriculture,* 700 F.2d 1262 (9th Cir.1983) (where employee performing inadequately agency did not abuse discretion in terminating rather than demoting plaintiff); *Bradbie v. Equal Employment Opportunity Commission,* 705 F.2d 1331, 1334 (Fed.Cir.1983) (demotion not excessive where testimony indicated that employee ineffective). It is not the function of this Court to make personnel decisions for governmental agencies. Therefore, after considering the testimony presented at our trial, and having reviewed the record of the administrative proceeding and the opinion of the administrative judge, we find that the decision to demote Dr. Shieh was justified.

Although we find that the agency did not discriminate against Dr. Shieh and that the agency did not abuse its discretion in affirming the agency decision, we will not hesitate to comment that Dr. Shieh's situation is most unfortunate: He is a Ph.D. who has been demoted, his already meager government salary has been further reduced, and he evidently has spent a great deal of time and money in an attempt to regain his status with the government. Accepting the testimony of his most recent supervisor, Dr. Nolan, it appears that Dr. Shieh may be improving his performance. We are not surprised to hear about such progress. With a Ph.D. from the Utah State University, and with some significant experience in the scientific community, Dr. Shieh has obvious talent. We hope that the agency will consider increasing Dr. Shieh's grade level as soon as possible.[3]

**3.** We think this may be particularly appropriate in light of the equal opportunity obligations

imposed by Executive Order 11478. In pertinent part, EO 11478 provides as follows:

We are convinced that there is substantial evidence to support the decisions of the agency and the MSPB, and that their decisions were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Accordingly, we affirm the decision of the MSPB sustaining the action of the USDA. We enter a verdict and judgment for defendant.

It is the responsibility of each department and agency head, to the maximum extent possible, to ... utilize to the fullest extent the present skills of each employee; [and] provide the maximum feasible opportunity to employees to enhance their skills so they may perform at their highest potential and advance in accordance with their abilities.

Exec. Order No. 11478, 44 Fed.Reg. 1053 (1978), *reprinted in,* 42 U.S.C. § 2000e note (1982). Although defendant has not violated this order in its demotion decision, we hope that this order encourages an appropriate future promotion.