Martha SANDOVAL, individually and on behalf of all others similarly situated, Plaintiffs-Appellees,

v.

L.N. HAGAN, in his official capacity as Director of the Alabama Department of Public Safety, and Alabama Department of Public Safety, Defendants-Appellants.

No. 98-6598.

United States Court of Appeals,

Eleventh Circuit.

Nov. 30, 1999.

Appeal from the United States District Court for the Middle District of Alabama. (No. CV-96-D-1875-N), Ira DeMent, Judge.

Before HULL and MARCUS, Circuit Judges, and RONEY, Senior Circuit Judge.

MARCUS, Circuit Judge:

Martha Sandoval, on her own behalf and as the representative of others similarly situated ("Appellees"), filed this lawsuit against the Alabama Department of Public Safety and its director L.N. Hagan, in his official capacity ("Appellants"), challenging the lawfulness of the Department of Public Safety's ("Department") official policy of administering its driver's license examination only in the English language. Appellees specifically alleged that the policy constituted discrimination on the basis of national origin in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d to 2000d-4 and its implementing regulations, as well as the Equal Protection Clause of the Fourteenth Amendment as secured by 42 U.S.C. § 1981 and 42 U.S.C. § 1983. After a bench trial, the district court entered a permanent injunction prohibiting the Department's enforcement of the English-only policy pursuant to Section 602 of Title VI, and ordered the Department to make reasonable accommodations for non-English speakers who applied for a driver's license.

Appellants broadly challenge the district court's order on three grounds: first, the lawsuit is barred by the Eleventh Amendment; second, Section 602 of Title VI does not contain an implied private cause of action; and finally, an English-language policy cannot constitute unlawful national origin discrimination as

a matter of law. After thoroughly reviewing the record and parties' briefs, we affirm the district court's judgment.

I.

The factual and procedural history surrounding this case are straightforward, uncontroverted, and laid out fully by the district court. Alabama, like almost every other state, historically has administered the written part of its Class D driver's license exam in a variety of foreign languages. From the 1970s to 1991, the Department administered the exam in at least fourteen foreign languages, including Spanish, Korean, Farsi, Cambodian, German, Laotian, Greek, Arabic, French, Japanese, Polish, Thai, and Vietnamese.

However, on July 13, 1990, an English-only Amendment to the Alabama Constitution was ratified. Amendment 509 states:

> English is the official language of the state of Alabama. The legislature shall enforce this amendment by appropriate legislation. The legislature and officials of the state of Alabama shall take all steps necessary to insure that the role of English as the common language of the state of Alabama is preserved and enhanced. The legislature shall make no law which diminishes or ignores the role of English as the common language of the state of Alabama.

> Any person who is a resident of or doing business in the state of Alabama shall have standing to sue the state of Alabama to enforce this amendment, and the courts of record of the state of Alabama shall have jurisdiction to hear cases brought to enforce this provision. The legislature may provide reasonable and appropriate limitations on the time and manner of suits brought under this amendment.

Approximately one year later, the Department adopted an English-only policy, requiring all portions of the driver's license examination process, including the written exam, to be administered in English *only*. Interpreters, translation dictionaries, and other interpretive aids were officially forbidden. However, the Department's official policy still continues to provide special accommodations for illiterate, hearing-impaired, deaf, and disabled applicants. Notably, the Department also permits non-English-speaking drivers from other states and foreign countries to exchange a valid out-of-state license for an Alabama license without taking the written exam.

Eight months after the implementation of the Department's English-only policy, the Department requested an opinion from Alabama's Attorney General regarding "whether Amendment No. 509 ... prohibits the Department from giving license tests in any language other than English." The opinion concluded that Amendment 509 required all applicants for driver's licenses to take the examination in English. Although the opinion candidly acknowledged that the English-only policy "might be a violation of Title VI of the Civil Rights Act of 1964, or the Equal Protection Clause of the Fourteenth Amendment, consideration of safety and integrity of the licensing process would, [in the words of the opinion], support a requirement that driver licensing examinations be given in English."

On December 31, 1996, Martha Sandoval, on her own behalf and as the representative of others similarly situated, filed suit in the United States District Court for the Middle District of Alabama against the Alabama Department of Public Safety, and its Director L.N. Hagan.[1] She sought a judgment declaring the Appellants' practice unlawful and unconstitutional, and permanently enjoining Appellants from continuing to test only in English.[2]

On September 3, 1997, the magistrate judge recommended that the district court grant Sandoval's motion to certify a plaintiff class. The Department did not object, and on October 17, 1997, the district court certified the class, naming Sandoval as the representative of the class of "all legal residents of the State of Alabama who are otherwise qualified to obtain a Class D private vehicle driver's license but cannot do so because they are not sufficiently fluent in English." Soon thereafter, Hagan and the Department moved for

---

[1]Sandoval's original complaint omitted Director Hagan from the Title VI claim but the district court granted Sandoval's Motion for Leave to Amend the Complaint which added Hagan as a named defendant.

[2]We construe Appellee's suit to be based on 49 C.F.R. § 21.5(b)(2) (Department of Transportation) and 28 C.F.R. § 42.104(b)(2) (Department of Justice) which require recipients of federal funds to not "directly, or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting [individuals] to discrimination on the basis of their race, color, or national origin." Appellants concede that these agency implementing regulations are valid exercises of agency authority under Section 2000d-1.

summary judgment, which the district court denied, concluding that "the issues raised are more amenable to disposition after a full legal and factual exploration at trial."

This case was tried to the court on February 17 and 18, 1998. At its close, the district court granted, with the full agreement of Appellees, Appellants' motion for judgment as a matter of law on Appellees' claim that the policy was adopted as a pretext for discrimination and that the Department intentionally discriminated on the basis of national origin. In addition, the district court granted Appellants' motion for summary judgment on Appellees' Section 1981 claims, finding that those claims were duplications of their Section 1983 claims.

Thereafter, the district court entered a memorandum opinion and order, ruling in Appellees' favor on their claim arising under Title VI's disparate impact regulations. The court enjoined Appellants from enforcing the English-only policy and directed the Department to "fashion proposed policies and practices for the accommodation of Alabama's non-English-speaking residents who seek Alabama's driver's licenses."

The district court made a series of factual findings that are undisputed on appeal. According to its findings, the Department receives more than one million dollars in federal funds every year from the United States Department of Transportation and the Department of Justice. The district court also determined that thousands of Alabama residents of foreign descent suffer adversely from the Department's English-only policy. Dr. Donald Bogie, Director of the Center for Demographics and Cultural Research at Auburn University, presented demographic and census evidence estimating that some 13,000 adult Alabama residents "would have difficulty in obtaining an Alabama driver's license because of the Department's English-only

policy." *Sandoval,* 7 F.Supp.2d at 1297.[3] The "vast" majority of this group are of foreign descent. *Id.* at 1283.

The district court also heard unrefuted testimony that spoke to the individualized impact of the policy on Alabama residents of foreign descent. Directors Brenda Bullock of the Hispanic Ministry of the Catholic Diocese of Birmingham and Floria Salazar of the Hispanic Ministry of the Catholic Diocese of Mobile testified that they knew of "hundreds" of adult residents of foreign descent who did not read or speak English fluently, and, as a result, are unable to obtain an Alabama driver's license. *See Sandoval,* 7 F.Supp.2d at 1291-92. Ms. Salazar herself knew of three hundred such adults, many of whom consequently drive without a license. She also testified that not having a license often affected the ability of these adults to obtain employment, child care services, and other life essentials. *See id.*[4]

---

[3]Doctor Bogie's demographic statistics were drawn from Bureau of Census reports. His analysis took into account several factors: (1) census and demographic figures for non- or limited-English-speaking Alabama residents; (2) projections of census undercounting for these groups; (3) growth rate projections for these groups; and (4) the primary languages spoken by these groups at home. *See Sandoval,* 7 F.Supp.2d at 1295-97. Dr. Bogie explained:

> The census findings indicate that from 1980 to 1990, the number of Alabama residents aged 18 years or older who "did not speak English well" or "did not speak English at all" more than doubled. In the 1980 census, 4,287 persons aged 18 years or older indicated that they "did not speak English well" or "did not speak English at all." In the 1990 census, the number was 10,158—an increase of 136.9 percent. If the same rate of increase is maintained throughout the 1990's, there will be a projected 24,069 adult Alabama residents in the year 2000 who will not be proficient in English.

> *See id.* Many of these non-English speakers are of foreign descent and census figures project that this Alabama demographic subgroup will increase in number significantly in the coming years. The Bureau of Census projects that the number of Hispanics aged 15 or older will increase by 10,227 during the 1990's (a gain of 61.3 percent), and that during the years 2000 to 2010, the Hispanic state population is estimated to grow 32.4 percent (a gain of another 8,715 persons). Additionally, the Asian and Pacific Islander state population is estimated to grow by 55 percent (a gain of 9,238 persons) during the 1990's and by 32.2 percent during the years 2000 to 2010 (a gain of another 8,300 persons). *See id.*

[4]The trial record also contains affidavits from Perla Raines, Secretary of the Montgomery Annex of the Catholic Hispanic Ministry in Montgomery, Alabama, and Boyd F. Campbell, a local lawyer and Chairman of the International Assistance Project of Alabama, a non-profit organization that helps non-citizens adapt to life in Alabama, attesting to their personal knowledge of adult residents of foreign descent unable to obtain

The district court also heard evidence outlining how the Department made special exam accommodations for other statutorily-protected groups but no accommodations for non-English speakers. Under official state policy, hearing-impaired, illiterate, deaf, and disabled residents receive substantial accommodation on the written exam and road skills test. *See id.* at 1287-89. Illiterate English speakers may take the test orally from a state examiner. Illiterate deaf applicants may make appointments to take the exam in sign language. *See id.* For those hearing-impaired applicants, who cannot adequately read and write English, a video exam is offered. *See id.* Additionally, the Department also grants driver's licenses to applicants of foreign descent who possess valid driver's licenses from other states or countries. These applicants are not required to pass the English-only written exam in order to obtain a state license. *See id.* at 1289-90. Finally, two members of the class, Martha Sandoval and Lorenzo Leon, testified about the policy's deleterious impact on their own lives. *See id.* at 1293-94. Sandoval is a permanent resident alien from Mexico who now lives in Mobile, Alabama. She speaks and understands a very limited amount of English, and cannot read a book in English. Spanish is her primary language. Leon is a permanent resident alien from Mexico who also resides in Mobile, Alabama. His primary language also is Spanish and he understands and speaks only a limited amount of English.

On the basis of this evidence, the district court found that the state policy exerted an adverse and disproportionate impact on non-English-speaking residents who applied for an Alabama driver's license. The court concluded that Appellants' English-only policy "singles out resident non-English speaking applicants by requiring them to take their examination in English only, without the aid of interpreters or translators." *Id.* at 1290.

The district court also reviewed each asserted state justification for the English-only driver's exam policy. The state offered six rationales for the English-only policy: (1) Amendment 509's requirement, (2) highway safety concerns, (3) administrative accommodation concerns, (4) exam integrity concerns, (5)

driver's licenses in Alabama. *See Sandoval,* 7 F.Supp.2d at 1292.

funding concerns, and (6) English is the official language of the United States. The district court found that none of the proffered rationales were " 'substantial legitimate justifications.' " *See id.* at 1297 (quoting *Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1407 (11th Cir.1993)).

On appeal, Appellants do not contest *any* of the district court's findings with respect to these proffered reasons. Among other things, the district court rejected four of the state's principal justifications: (1) highway safety, (2) exam administration, (3) exam integrity, and (4) budgetary constraints. First, the court noted that the state produced *no* evidence at trial that non-English speakers posed greater highway safety risks than English speakers. *See id.* at 1300. Harold Hammond, second-in-command of the Department from 1987 to 1991, and Chief of the Department's Driver's License Division from 1978 to 1987, testified that he was aware of no such evidence from the time of his tenure with the Department. *See id.* Further, the court concluded that the State undermined its own safety rationale through a policy of honoring valid licenses from non-English speakers of other locales, and making test accommodations for illiterate, deaf, and disabled drivers—although these groups might pose theoretically greater safety risks than other population subgroups. *See id.*

Second, the court also found the exam administration and integrity rationales meritless. Trial evidence indicated that, for over a decade, the Department had offered the written exam in fourteen foreign languages without any administrative difficulty. *See id.* at 1302. Trial testimony from department personnel confirmed this conclusion. *See id.* The trial court discounted the validity of exam cheating as a significant concern. *See id.* at 1307-08.

Finally, the district court discerned that the Department could afford to accommodate non-English speakers within its budgetary limits. The court credited trial testimony stating that financial constraints were not a decisionmaking factor behind the Department's English-only policy. *See id.* at 1313. Trial evidence also established that the Department, prior to the English-only policy, had been able to use volunteer translators, and obtain exam translations at *no* cost. *See id.* At trial, the Department was unable to

**7**

demonstrate that a return to this policy was not feasible. The district court also determined that even if the Department could not afford translators, other alternatives, like audio-taped instructions or allowing applicants to pay for or provide their own translators, were readily available. *See id.* Finally, the district court found that the annual budget for the Department was $50 million dollars, and that it could afford to hire some professional translators. *See id.* at 1312-13 (finding that translator costs would be minimal). The court concluded that all of these rationales were a pretext, specifically crediting testimony that the Department never had considered ending the translation policy prior to Amendment 509's ratification. *See Sandoval,* 7 F.Supp.2d at 1313.

Pursuant to the district court's order, a stay pending appeal was entered in exchange for Appellants' implementation of a plan for testing in languages other than English. Appellants agreed to procure translations of the examination into Spanish, German, Korean, Japanese, French, Mandarin Chinese, and Vietnamese.

On June 17, 1998, Appellees filed a Motion to Alter or Amend Judgment, requesting that the district court either rule in their favor on their equal protection claim or expressly reserve ruling on that claim. The district court granted Appellees' motion and reserved ruling on the equal protection claim.

On July 28, 1998, Appellants timely filed a notice of appeal.

II.

We review the district court's conclusions of law *de novo. See Motorcity of Jacksonville, Ltd. v. Southeast Bank,* 83 F.3d 1317, 1323 (11th Cir.1996) (en banc), *vacated on other grounds, Hess v. FDIC,* 519 U.S. 1087, 117 S.Ct. 760, 136 L.Ed.2d 708 (1997). Findings of fact, however, may not be disturbed unless they are clearly erroneous. *See* Fed.R.Civ.P. 52(a); *DeKalb County Sch. Dist. v. Schrenko,* 109 F.3d 680, 687 (11th Cir.1997). The entry of a permanent injunction is reviewed for abuse of discretion. *See Simmons v. Conger,* 86 F.3d 1080, 1085 (11th Cir.1996).

On appeal, Appellants do not challenge the district court's factual findings, its use of Title VII disparate impact principles to analyze Appellants' Title VI claims, or its formulation of the disparate impact analyses. Instead, Appellants make only three broad claims: first, the suit is barred by the Eleventh Amendment; second, Section 602 of Title VI does not contain an implied private cause of action; and finally, an English language policy cannot discriminate on the basis of national origin as a matter of law. We address each claim in turn.

III.

*Eleventh Amendment*

The Eleventh Amendment to the United States Constitution states: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Amendment also equally bars suits against a state commenced by that state's own citizens. *See Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana,* 134 U.S. 1, 13-15, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Further, the Amendment bans suits against state officials where the state, in fact, is the real party in interest. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) [hereinafter *Pennhurst II* ]. In general, these bans prohibit federal courts from exercising subject matter jurisdiction over private party suits filed against a state or state officials.

However, three exceptions to this constitutional bar have been recognized by the Supreme Court. First, individual suits may proceed directly against a state if a state waives its sovereign immunity. *See Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). Second, individual suits against a state also may be adjudicated if Congress, pursuant to a valid exercise of congressional power, abrogates a state's immunity through a clear statement of its intent to abrogate. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Finally,

**9**

individual suits that seek *prospective* relief for *ongoing* violations of federal law also may be levied against state officials. *See Ex Parte Young,* 209 U.S. 123, 159-60, 28 S.Ct. 441, 52 L.Ed. 714 (1908). In the instant case, Appellees sued both the Department and its Director, L.N. Hagan, in his official capacity. On appeal, Appellants contend that even if Title VI accords Appellees an implied cause of action, the Eleventh Amendment bars this particular suit on sovereign immunity grounds. They contend that Appellees' suit is barred as it relates to both the Department and Director Hagan. Specifically, Appellants present three arguments: first, the Department's acceptance of federal funds does not constitute a waiver of state immunity under the Spending Clause power; second, Title VI does not comprise a valid congressional abrogation of state immunity under Section Five of the Fourteenth Amendment; and finally, the *Ex Parte Young* doctrine does not apply to Director Hagen.

A.

*Waiver*

It is an "unremarkable" commonplace that states may waive their sovereign immunity through overt consent. *Seminole Tribe,* 517 U.S. at 65, 116 S.Ct. 1114; *see also Cate v. Oldham,* 707 F.2d 1176, 1183 n. 4 (11th Cir.1983). It is equally true that a state may waive its sovereign immunity by accepting federal funds. Under the Spending Clause power of Article I, Congress is empowered to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." Art. I, § 8, cl. 1. As the Supreme Court repeatedly has recognized, "[i]ncident to this power, Congress may attach conditions on the receipt of federal funds ... 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole,* 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (citations omitted). Moreover, the Spending Clause power is substantial and Congress may accomplish "objectives not thought to be within Article I's 'enumerated legislative fields' ... through the use of the spending power and the conditional grant of federal funds." *Dole,* 483 U.S. at 208, 107 S.Ct. 2793 (quoting

*United States v. Butler,* 297 U.S. 1, 66, 56 S.Ct. 312, 80 L.Ed. 477 (1936)).  Specifically, under the Spending

Clause power, the federal government may condition a waiver of state sovereign immunity upon the receipt

of federal monies.  *See Atascadero,* 473 U.S. at 238 n. 1, 105 S.Ct. 3142 (noting that "a State may effectuate

a waiver of its constitutional immunity ... by otherwise waiving its immunity in the context of a particular

federal program");  *Edelman,* 415 U.S. at 672, 94 S.Ct. 1347 (noting that a state may waive immunity "by

its participation in [a] program authorized by Congress").  However, a Spending Clause waiver requires an

"unequivocal indication" that a State has consented to federal jurisdiction—either " 'by the most express

language or by such overwhelming implication from the text as (will) leave no room for any other reasonable

construction.' "  *Edelman,* 415 U.S. at 673, 94 S.Ct. 1347 (quoting *Murray v. Wilson Distilling Co.,* 213 U.S.

151, 171, 29 S.Ct. 458, 53 L.Ed. 742 (1909)).  To satisfy this "clear statement" waiver requirement, a statute

must evince a "clear intent to condition participation in the programs funded under the Act on a State's

consent to waive its constitutional immunity."  *Atascadero,* 473 U.S. at 247, 105 S.Ct. 3142.

Neither side disputes that Title VI, Section 2000d-7 of the Rehabilitation Act Amendments of 1986,

explicitly waives state sovereign immunity for Title VI suits in accordance with the *Atascadero* waiver

formula.[5]  Passed a year after *Atascadero* was decided, the provision reads in relevant part:  "[A] State shall

---

[5]Appellants, however, contend that this abrogation statement applies only to Title VI and not to its accompanying administrative regulations promulgated under Section 602. This claim is without merit. There is no evidence that Congress somehow differentiated between suits to enforce the statute and suits to enforce the regulations promulgated thereunder when it constructed its abrogation/waiver provision. *See Sandoval,* 7 F.Supp.2d at 1272.  The Title VI regulations at issue were promulgated pursuant to the statute's unambiguous directive to federal agencies contained in 42 U.S.C. § 2000d-1.  These regulations "effectuate the provisions of Section 2000d"—the statutory prohibition against discrimination—and are not separate from the statute. *See Lau v. Nichols,* 414 U.S. 563, 566-69, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974).  Moreover, when Section 2000d-7 was passed, Congress already had rejected efforts to rescind the disparate impact regulations, and "with full awareness of how agencies were interpreting Title VI, ha[d] modeled later statutes on § 601 of Title VI, thus indicating approval of the administrative definition." *Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 593 n. 14, 103 S.Ct. 3221, 77 L.Ed.2d 866. (1983) (Marshall, J.).  From these factors, it is plain that Congress intended Section 2000d-7 to abrogate state immunity with respect to both the statutory provisions and administrative regulations of Title VI. Several lower district courts have reached similar conclusions. *See Bryant v. New Jersey Dept. of Transp.,* 1 F.Supp.2d 426, 431-35 (D.N.J.1998) (rejecting Eleventh Amendment defense to suit brought entirely under Title VI regulations);  *Grimes v. Sobol,* 832 F.Supp. 704, 707 (S.D.N.Y.1993) (same), *aff'd,* 37 F.3d 857 (2d Cir.1994).

not be immune under the Eleventh Amendment ... from suit in Federal Court for a violation ... *of Title VI ...* or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." 42 U.S.C. § 2000d-7 (emphasis added). The provision's plain language manifests an unmistakable intent to condition federal funds on a state's waiver of sovereign immunity. The Supreme Court has reached this conclusion, describing Section 2000d-7 as an "unambiguous waiver of the States' Eleventh Amendment immunity." *See Lane v. Pena,* 518 U.S. 187, 200, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (drawing this conclusion in the context of a parallel Title IX provision). Indeed, every federal circuit that has considered this issue also has found Section 2000d-7 to constitute a "clear statement" waiver of state sovereign immunity in exchange for the receipt of federal funds. *See Little Rock v. Mauney,* 183 F.3d 816, 821-22 (8th Cir.1999) (finding Section 2000d-7 to constitute an immunity waiver for Section 1403 of the IDEA, a parallel provision to the Title VI waiver); *Marie O. v. Edgar,* 131 F.3d 610, 617-18 (7th Cir.1997) (same); *Clark v. California,* 123 F.3d 1267, 1271 (9th Cir.1997), *cert. denied,* --- U.S. ----, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998) (finding Section 2000d-7 to constitute a state immunity waiver for Section 504 of the Rehabilitation Act of 1973, a parallel provision to the Title VI waiver); *see also Beasley v. Alabama State Univ.,* 3 F.Supp.2d 1304, 1307-16 (M.D.Al.1998) (finding Section 2000d-7 to be a valid waiver under the Spending Clause power for Title IX suits after detailed analysis and discussion).

The recognition of a "clear statement" Spending Clause waiver also is consonant with recent doctrinal developments in sovereign immunity. The Supreme Court has reaffirmed the constitutionality of conditioning federal funds upon the waiver of state sovereign immunity. In *College Savings,* the Court analogized federal monies to "gifts" that a state may accept or reject of its own accord. *See College Savings v. Florida Prepaid Postsecondary Educ. Expense Bd.,* --- U.S. ----, 119 S.Ct. 2219, 2231, 144 L.Ed.2d 605 (1999). The Supreme Court also recognized that "Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking of certain actions that Congress could not require them to take, and that acceptance of the fund[s] entails an agreement to the actions," so long as the conditions placed on these funds

**12**

are not so "coercive" as to eviscerate the "voluntariness of [the] waiver." *Id.* (citation omitted); *see also*

*Lawrence County v. Lead-Deadwood Sch. Dist.,* 469 U.S. 256, 269-70, 105 S.Ct. 695, 83 L.Ed.2d 635 (1985)

(remarking that "it is far from a novel proposition that pursuant to powers under the Spending Clause,

Congress may impose conditions on the receipt of federal funds absent some independent constitutional bar");

*Autery v. United States,* 992 F.2d 1523, 1527 n. 7 (11th Cir.1993) (noting that "those who seek federal

financial assistance, whether it be states, non-profit organizations, or individuals, have a choice whether to

participate in a federal program.  But once that decision to participate is made, the grant recipient is bound

by any mandatory rules imposed by federal law.").

Unlike the Commerce Clause power, *see* Art. I, § 8, cl. 2, the Spending Clause power does not

abrogate state immunity through unilateral federal action.  Rather, states are free to accept or reject the terms

and conditions of federal funds much like any contractual party.  *See Pennhurst State Sch. & Hosp. v.

Halderman,* 451 U.S. 1,17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) [hereinafter *Pennhurst I* ] (noting that

"legislation enacted pursuant to the spending power is much in the nature of a contract:  in return for federal

funds, the States agree to comply with federally imposed conditions").  In this way, conditioning federal funds

on an explicit state waiver of sovereign immunity does not violate bedrock principles of federalism.  As the

Supreme Court delineated in *New York,* Congress may offer financial incentives to induce state action so long

as "Congress encourages state action rather than compelling it." *New York v. United States,* 505 U.S. 144,

168, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).  Inducements rather than abrogations leave "the ultimate

decision as to whether or not the State will comply" in the hands of the State and its citizens rather than the

federal government. *Id.;  see also Bell v. New Jersey,* 461 U.S. 773, 790, 103 S.Ct. 2187, 76 L.Ed.2d 312

(1983) ("[r]equiring States to honor the obligations voluntarily assumed as a condition of federal funding ...

simply does not intrude on their sovereignty").  Therefore, we can find no constitutional defect inherent in

the explicit state immunity waiver enacted pursuant to the Spending Clause in Section 2000d-7.

**13**

Nevertheless, Appellants argue that although they have continued to accept federal funding after the effective date of Section 2000d-7, their grant agreements with the Department of Transportation and Department of Justice fail to obligate Alabama to administer driver's license exams in foreign languages. Appellants claim that because Title VI is Spending Clause legislation, *see Davis v. Monroe County Bd. of Educ.,* 120 F.3d 1390, 1398-99 (11th Cir.1997) (en banc) (describing Title VI as Spending Clause legislation for statutory construction purposes), *rev'd on other grounds, Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), they are entitled to explicit notice that accepting federal funds prohibits them from requiring exam applicants to take an English language driver's exam.  We are not persuaded by Appellants' claim that they were provided insufficient notice of their obligations under Title VI.

As discussed earlier, Spending Clause legislation functions as a quasi-contract between Congress and the States.  *See Pennhurst I,* 451 U.S. at 17, 101 S.Ct. 1531.  Under this financial arrangement, Congress may attach conditions on those states who accept federal funds—provided " 'Congress speak[s] with a clear voice' " in outlining its conditions.  *Davis,* 119 S.Ct. at 1670 (quoting *Pennhurst I,* 451 U.S. at 17, 101 S.Ct. 1531).  In determining whether a statute and its accompanying administrative regulations provide recipient states with the requisite level of notice for imposing funding conditions, we rely on traditional methods of statutory construction.  *See School Bd. of Nassau County v. Arline,* 480 U.S. 273, 286 n. 15, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987).  However, once Congress clearly signals its intent to attach federal conditions to Spending Clause legislation, it need not specifically identify and proscribe in advance every conceivable state action that would be improper.  *Bennett v. Kentucky Dep't of Educ.,* 470 U.S. 656, 666-69, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985) (noting that federal grant programs cannot prospectively resolve every possible "ambiguity" concerning particular applications of their statutory requirements).

In this case, Alabama received ample notice of its nondiscrimination obligations under Title VI. Title VI flatly prohibits discrimination on the basis of national origin and, in turn, English language policies that

cause a disparate impact on the basis of national origin. Section 601 of Title VI forbids discrimination based on "national origin, in *any* program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (emphasis added). Section 602 of the Act also grants federal agencies like the Department of Transportation and the Department of Justice the authority to issue rules and regulations to ensure that recipients of federal aid "conduct any federally financed projects consistently with Section 601." *Lau v. Nichols,* 414 U.S. 563, 566, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). The Supreme Court consistently has held that recipients of federal funds must comply with Title VI's nondiscrimination mandate as well as the statute's implementing regulations as promulgated by federal administrative agencies. *See id.* at 570-71, 94 S.Ct. 786 (Stewart, J., concurring). Moreover, agency regulations are accorded substantial deference in assessing whether they outline a permissible construction of a congressional statute's purpose. *See Chevron, U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *United States v. Board of Trustees for the Univ. of Alabama,* 908 F.2d 740, 746-47 (11th Cir.1990).

In this case, a number of federal agencies articulated implementing regulations for Title VI, plainly notifying recipient states like Alabama of their duty not to engage in policies causing a disparate impact based on national origin. Department of Transportation and Department of Justice regulations prohibit grant recipients from employing "criteria or methods of administration which have the effect of subjecting [individuals] to discrimination because of their ... national origin." 49 C.F.R. § 21.5(b)(2)(DOT); 28 C.F.R. § 42.104(b)(2)(DOJ) (same). Indeed, the Department of Justice, the principal federal agency for coordinating Title VI requirements,[6] also has promulgated a longstanding regulation instructing all executive agencies on when grant recipients must provide foreign language assistance:

---

[6]When Congress entrusts more than one federal agency to enforce a statute, the Supreme Court has accorded wide deference to the regulations promulgated by the agency charged by Executive Order with coordinating government-wide compliance. *See Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 634, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984). In this case, the Department of Justice has been authorized by Executive Order to coordinate government-wide compliance with Title VI. *See* Exec. Order No. 11,247, 30 Fed. Reg. 12327 (1965); Exec. Order No. 12250, 45 Fed. Reg. 72, 995 (1980).

**15**

> Where a significant number or proportion of the population eligible to be served or likely to be directed affected by a federally assisted program (e.g., affected by relocation) needs service or information in a language other than English in order effectively to be informed of or to participate in the program, *the recipient shall take reasonable steps, considering the size and concentration of such population, to provide information in appropriate languages to such persons.* This requirement applies with regard to written material of the type which is ordinarily distributed to the public.

28 C.F.R. § 42.405(d)(1) (1976) (emphasis added). Moreover, other federal agencies also have adopted longstanding positions that the denial of benefits to non-English speakers may yield a disparate impact based on national origin in violation of Title VI.[7] Notably, Appellants do not contest these longstanding federal agency interpretations of Title VI.

Moreover, the Supreme Court specifically has read Title VI and its implementing regulations to prohibit English language policies which yield a disparate impact on non-English speakers. In *Lau,* a large group of Chinese-speaking minority students were denied supplemental English language instruction by the San Francisco school system. Regulations promulgated by the Department of Health, Education, and Welfare ("HEW") under Section 602 of Title VI required:

> Where inability to speak and understand the English language excludes national origin-minority group children from effective participation in the educational program offered by a school district, the district must take affirmative steps to rectify the language deficiency in order to open its

---

[7]The Department of Health, Education, and Welfare ("HEW"), the predecessor to the Department of Education ("DOE"), issued a 1970 policy memorandum informing that "[w]here [the] inability to speak and understand the English language excludes national origin-minority group children from *effective participation* in the educational program offered by a school district, the district must take affirmative steps ... to open its instructional program to these students." 35 Fed.Reg. 11,595 (1970). As recently as last year, the Department of Health and Human Services ("HHS") issued a guidance memorandum stating that "[t]he United States is ... home to millions of national origin minority individuals who are limited in their ability to speak, read, write, and understand the English language [and that] [b]ecause of these language barriers, [limited English proficiency (LEP) ] persons are often excluded from programs or experience delays or denials of services from recipients of Federal assistance." The memo concluded that "[w]here such barriers *discriminate or have had the effect of discriminating on the basis of national origin,* OCR [the Office of Civil Rights] has required recipients to provide language assistance to LEP persons." U.S. Dept. of Health and Human Services' Office of Civil Rights Memorandum, *Title VI Prohibition Against National Origin Discrimination-Persons with Limited English Proficiency,* at 1-2 (1998) (emphasis added); *see Sandoval* 7 F.Supp.2d at 1282. Since 1980, the agency "has conducted a large number of complaint investigations and compliance reviews in this area. In these cases, OCR [the Office of Civil Rights] has consistently concluded that recipients have an obligation under Title VI to communicate effectively with persons of limited English proficiency." 45 Fed.Reg. 82,972 (1980).

instructional program to these students ... Any ability grouping or tracking system employed by the school system to deal with the special language skill needs of national origin-minority group children must be designed to meet such language skill needs as soon as possible and must not operate as an educational deadend or permanent track.

*Id.* at 568, 94 S.Ct. 786.

Based on the validity of these regulations as an interpretation of the substantive meaning of Title VI, the Supreme Court found the school district's language policy to clearly violate Title VI. *See id.* at 568, 94 S.Ct. 786; *id.* at 571, 94 S.Ct. 786 (Stewart, J., concurring). The Supreme Court explained:

[I]t seems obvious that the Chinese-speaking minority receive fewer benefits than the English-speaking majority from respondents' school system which denies them a meaningful opportunity to participate in the educational program-all earmarks of the discrimination banned by the [HEW] regulations.

*Id.* at 568, 94 S.Ct. 786. Further, the Supreme Court determined that the HEW regulations properly attached nondiscrimination conditions to funding recipients under the Spending Clause power. *Id.* at 568-69, 94 S.Ct. 786 (finding that "the Federal Government has power to fix the terms on which its money allotments to the States shall be disbursed," and that as a result, "[r]espondent school district contractually agreed to 'comply with title VI of the Civil Rights Act of 1964 ... and all requirements imposed by or pursuant to the Regulation of HEW' ") (quoting *Oklahoma v. United States Civil Service Comm'n,* 330 U.S. 127, 142-43, 67 S.Ct. 544, 91 L.Ed. 794 (1947)). Rejecting the claim that the school lacked proper notice of its Title VI obligations, the Supreme Court concluded that "whatever may be the limits of [the Spending Clause] power, they have not been reached here." *Lau,* 414 U.S. at 569, 94 S.Ct. 786. The *Lau* decision subsequently was ratified by Congress in its Education Amendments of 1974, Pub.L. No. 93-380, §§ 105, 204, 88 Stat. 503-512, 515 (codified at 20 U.S.C. § 1703(f), and Bilingual Education Act, 20 U.S.C. § 7401 *et seq.*).[8] Therefore, *Lau*

---

[8]These enactments adopted the holding of *Lau* and provided funds to aid local school districts in providing bilingual education to comply with *Lau* and Title VI. *See* 20 U.S.C. § 7402(a)(15) (stating that the "Federal Government as exemplified by Title VI of the Civil Rights Act of 1964 ... has a special and continuing obligation to take appropriate action to provide equal educational opportunities to children and youth of limited English proficiency"); *Castaneda v. Pickard,* 648 F.2d 989, 1008 (5th Cir.1981) (noting that Congress subsequently adopted the "essential" holding of *Lau* in the Education Amendments of 1974 and the Bilingual Education Act).

and its subsequent legislative history also unambiguously notify state recipients of federal funds that English language policies, which cause a disparate impact on the ability of non-English speakers to enjoy federal benefits, may violate Title VI.[9]

This conclusion is altogether consonant with our approach to other federal civil rights provisions. In *Arline,* the Supreme Court rejected a *Pennhurst I* lack of notice claim with respect to Section 504 of the Rehabilitation Act. *See id.* at 286 n. 15, 107 S.Ct. 1123. The Court found that the Act's legislative history combined with its implementing administrative regulations adequately notified recipient states of their statutory obligations not to discriminate. *See id.*[10] Following *Arline,* our circuit has read federal antidiscrimination statutes similarly in evaluating whether they provide sufficient notice to recipient states. We have looked *both* to a statute's legislative history and subsequently-promulgated implementing regulations in assessing the breadth of a statute's funding conditions. In *Board of Trustees,* for example, we interpreted

---

[9]Appellants contend that *Lau* is inapposite because the decision merely required supplemental English language instruction for Chinese-American students, and did not mandate that the school district "speak in foreign tongues" to the students. In fact, the *Lau* court thrust *no* specific remedy on the district. The Supreme Court found that the district had to take "affirmative steps" to rectify the language-oriented disparate impact but left the district's remedial options flexible. The Court explained:

> No specific remedy is urged upon us. Teaching English to the students of Chinese ancestry who do not speak the language is one choice. Giving instructions to this group in Chinese is another.

*Id.,* 414 U.S. at 564-65, 94 S.Ct. 786. We interpret this instruction as an order to the school district to remedy the disparate impact by the most efficacious means available—leaving the ultimate policy choice to the expert opinion of the district's educators. Similarly, here, the district court found Appellants' English-only policy to exert a disparate impact based on national origin, and ordered Appellants to "fashion proposed policies and practices for the accommodation of Alabama's non-English speaking residents who seek Alabama driver's licenses." No specific policy has been mandated by the district court, and Appellants have yet to submit a compliance proposal. We therefore deem it premature to speculate on the appropriateness of potential court-imposed remedies.

[10]The *Arline* Court explained, "[i]n *Pennhurst* ... the statutory provisions were thought to be only statements of 'findings' indicating no more than a congressional preference—at most a 'nudge in the preferred directio[n.]' The contrast between the congressional preference at issue in *Pennhurst* and the antidiscrimination mandate of § 504 could not be more stark." *Arline,* 480 U.S. at 280 n. 15, 107 S.Ct. 1123 (quoting *Pennhurst I,* 451 U.S. at 17, 101 S.Ct. 1531).

**18**

Section 504 of the Rehabilitation Act of 1973 to provide notice to the States that they could be required to provide and pay for interpreters for deaf persons. *See Board of Trustees,* 908 F.2d at 750. There, we concluded that despite "Section 504's general language and sparse legislative history," it was reasonable for HEW to interpret the statute, through implementing regulations, to require state interpreters for the deaf as a "related service" under the Act. *Id.* at 748.[11] With Title VI, there is an even clearer legislative purpose of remedying pervasive discrimination.[12]

Moreover, this nondiscrimination purpose is supplemented by multiple administrative agency regulations expressly associating disparate impact English language policies with national origin

---

[11]In reaching this result, we noted that administrative agency constructions of a statute are entitled to substantial deference. *See id.* (citing *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778; *Arline,* 480 U.S. at 279, 107 S.Ct. 1123). As a result, we deferred to an agency interpretation to determine the breadth of the antidiscrimination provision at issue. We explained, "HEW's decision that the provision of interpreters is necessary to comply with the non-discrimination mandate of Section 504, and does not amount to an affirmative action requirement, is a policy choice that HEW is empowered to make." *Board of Trustees,* 908 F.2d at 749 (stating that " '[t]he power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left ... by Congress.' ") (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778) (citation omitted). The Supreme Court employed a similar approach in *Irving.* There, the Court held that under the Education of the Handicapped Act, it was appropriate to rely on *agency regulations* in determining the breadth of the "related" services that the states were bound to provide. *See Irving Indep. Sch. Dist. v. Tatro,* 468 U.S. 883, 891-92 & n. 8, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984).

[12]The legislative record is replete with descriptions of Title VI as a remedial statute. For example, Senator Hubert Humphrey, the Senate manager of the Civil Rights Act of 1964, explained that the objective of Title VI was to "make sure that the funds of the United States are not used to support racial discrimination." 110 Cong. Rec. 6544 (Statement by Sen. Humphrey). Senator Pastore made the point more directly:

> That is why we need Title VI of the Civil Rights Act, H.R. 7152- to prevent such discrimination where Federal funds are involved.... Title VI is sound; it is morally right; it is legally right; it is constitutionally right.... What will it accomplish? It will guarantee that the money collected by colorblind tax collectors will be distributed by Federal and State administrators who are equally colorblind. Let me say it again. The title has a simple purpose—to eliminate discrimination in federally financed programs.

110 Cong. Rec. 7054 (1964) (Statement by Sen. Pastore). *See also Guardians,* 463 U.S. at 591-92, 103 S.Ct. 3221 (White, J.); *id.* at 620-22, 103 S.Ct. 3221 (Marshall, J.); *id.* at 643-45, 103 S.Ct. 3221 (Stevens, J., Brennan, J., Blackmun, J.); *Lau,* 414 U.S. at 570, 94 S.Ct. 786.

discrimination. In fact, there was evidence that Alabama possessed actual notice that the English-only policy violated Title VI. As we have noted, the Alabama Attorney General issued an advisory opinion on the English-only state amendment which warned that "requiring an ability to understand English as a requirement to participate in some state programs might be a violation of Title VI of the Civil Rights Act of 1964." *See Sandoval,* 7 F.Supp.2d at 1286.

Nevertheless, Appellants argue that Title VI does not require federal grantees to refrain from implementing English-only policies, citing two circuit court cases, *Gloor,* a Fifth Circuit case with binding force on our circuit's case law,[13] and *Spun Steak,* a Ninth Circuit case, for this proposition. Both cases are inapposite. In *Gloor* and *Spun Steak, bilingual* plaintiffs brought Title VII suits asserting that English-only workplace policies constituted a disparate impact based on national origin. *See Garcia v. Gloor,* 618 F.2d 264 (5th Cir.1980); *Garcia v. Spun Steak,* 998 F.2d 1480 (9th Cir.1993). While both courts rejected these claims, their decisions rested on the *bilingual* status of the plaintiffs. As bilingual speakers, the plaintiffs did not suffer an adverse impact from being required to speak in English while at work. *See Gloor,* 618 F.2d at 270-71; *Spun Steak,* 998 F.2d at 1490. Notably, this case does not involve bilingual speakers but rather license applicants not proficient in the English language at all. As the *Gloor* court distinguished, "to a person who speaks only one tongue or to a person who has difficulty using another language than the one spoken in his home, language might well be an immutable characteristic like skin color, sex, or place of birth." *Id.* at 270. Under *Gloor* 's dicta, plaintiffs, like Martha Sandoval, could bring a disparate impact suit under Title VI. *See id.* Nothing in *Gloor* suggests otherwise.[14] In short, Appellants had "adequate" notice that their

[13]Decisions by the Fifth Circuit prior to September 30, 1981 constitute binding precedent in our circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981).

[14]Appellants also rely on *Gebser.* In *Gebser,* the Supreme Court ruled that a school district receiving federal funding under Title IX could not be held liable for money damages resulting from a teacher's sexual harassment of a student in the absence of actual notice and deliberate indifference on the part of the district. *See Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 118 S.Ct. 1989, 1998-99, 141 L.Ed.2d 277 (1998). *Gebser* is distinguishable; notably, it involved monetary liability arising from the actions of an unauthorized third party. In contrast, this case involves only injunctive relief for official state policy. Further, the *Gebser*

English-only driver's license exam requirement violated Title VI. *Davis,* 119 S.Ct. at 1664 (concluding that Spending Clause legislation only must provide recipient states with "adequate" notice).

We therefore hold that the Alabama Department of Public Safety by voluntarily accepting these federal monies has waived any claim of sovereign immunity from individual Title VI suits. Appellees' suit is not barred by the Eleventh Amendment against the State of Alabama.[15]

B.

### Ex Parte Young

Even if the Eleventh Amendment barred Appellees' action against the State of Alabama—and we do not believe it does—Appellees' suit, as it relates to Director Hagan, in his official capacity, still could proceed, and Appellees still could obtain *injunctive* relief against the Department's English-only exam policy. Since *Ex Parte Young,* suits directed against state officials that seek *prospective* relief for *continuing* violations are not barred on Eleventh Amendment grounds. *See Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). This doctrinal exception to state sovereign immunity is well-established. *See Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 269, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) (reaffirming

---

Court specifically distinguished its case posture from situations involving "official policy of the recipient entity." *See id.* at 1999. The Supreme Court never has held that a state must have actual notice of its policy's unlawfulness to be liable for injunctive relief. In fact, the Court specifically has authorized injunctive relief under Title VI despite the fact that "where discrimination is unintentional, 'it surely is not obvious that the grantee was aware that it was administering the program in violation of the [condition].' " *Id.* at 1998 (quoting *Guardians,* 463 U.S. at 598, 103 S.Ct. 3221). Additionally, injunctive relief does not carry quite the same liability consequences as compensatory relief. At bottom, notice is a fairness argument; namely, a defendant did not know that his conduct was unlawful or harmful, and therefore should not be forced to remunerate the plaintiff. Injunctive relief involves no compensation. It requires a defendant to stop its unlawful activity. For this reason, the Supreme Court has distinguished between injunctive and compensatory relief in terms of the applicable notice standard. Compensatory relief requires actual notice. *See Gebser,* 118 S.Ct. at 1999; *Davis,* 119 S.Ct. at 1664. Injunctive relief based on an implied cause of action only requires "adequate" notice. *See Davis,* 119 S.Ct. at 1664, 1670-71; *Guardians,* 463 U.S. at 598, 103 S.Ct. 3221. These differences render *Gebser* and *Davis* inapposite.

[15]Because we hold that Alabama properly waived its sovereign immunity by receiving federal funds from the Department of Transportation and the Department of Justice, we need not address Appellants' congressional abrogation claim.

**21**

that a plaintiff seeking prospective relief against a state official's ongoing violation of federal law can proceed in federal court); *Summit Medical Assoc. v. Pryor,* 180 F.3d 1326, 1336-38 (11th Cir.1999) (same). The doctrine prohibits state officers from enforcing state policies in violation of the Constitution or federal law under a legal "fiction" that "creates an imaginary distinction between the state and its officers, deeming the officers to act without the state's authority, and hence, without immunity protection, when they enforce state laws in derogation" of federal or constitutional rights. *Id.* at 1337.

The applicability of the doctrine turns on three considerations; first, does the Plaintiff seek prospective or retrospective relief; second, is the violation ongoing and continuous; and finally, would equitable relief " 'implicate special sovereignty interests.' " *Id.* at 1337 (quoting *Coeur d'Alene,* 521 U.S. at 281, 117 S.Ct. 2028). Both parties agree that the first two considerations are easily satisfied. Appellees seek prospective relief in the form of a permanent injunction for alleged ongoing violations of Title VI. However, Appellants rely on *Seminole Tribe* in arguing that the suit implicates "special sovereignty interests" because Section 602 of Title VI evinces a congressional intent to avoid *Ex Parte Young* remedies. *Id.,* 517 U.S. at 59, 116 S.Ct. 1114. We are not persuaded. First, we have concluded, *infra,* in Part IV, that a private cause of action is consonant with Section 602 of Title VI. The Supreme Court also has held that Title VI's statutory scheme is not inconsistent with a private right of action, *see Cannon v. Univ. of Chicago,* 441 U.S. 677, 704, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Guardians,* 463 U.S. at 592-93, 103 S.Ct. 3221; *id.* at 620-22, 103 S.Ct. 3221 (Marshall, J.); *id.* at 641-45, 103 S.Ct. 3221 (Stevens, J., Brennan, J., Blackmun, J.). Second, we find no comparison between the intricate remedial scheme of the Indian Gaming Regulatory Act ("IGRA") at issue in *Seminole Tribe* and Section 602 of Title VI. Title VI, unlike the IGRA, contains no explicit remedial scheme for private rights of action. Instead, such suits would be governed by the "general rule" under which "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin,* 503 U.S. at 70-71, 112 S.Ct. 1028. Third, we already have found injunctive relief to be "appropriate" relief for

a private cause of action under the Title VI framework. *See Cone Corp. v. Florida Dep't of Transp.,* 921 F.2d 1190, 1201 n. 37 (11th Cir.1991). Fourth, the remedial framework outlined in Title VI applies to grant and fund terminations by the federal government and not to private suits. *See* 42 U.S.C. § 2000d-1. Title VI also contains no express limitations on the remedial powers of federal courts, unlike the IGRA. *Compare* 42 U.S.C. § 2000d-1, *with Seminole Tribe,* 517 U.S. at 59-60, 116 S.Ct. 1114. Finally, our circuit also has allowed private suits to proceed under the doctrine of *Ex Parte Young* for injunctive relief under Section 504 of the Rehabilitation Act. *See, e.g., Lussier v. Dugger,* 904 F.2d 661, 670 n. 10 (11th Cir.1990). Section 504 expressly incorporates Title VI remedies, *see* 29 U.S.C. § 794(a)(2), and consistently has been construed as being similar to Title VI for statutory construction purposes. *See Alexander v. Choate,* 469 U.S. 287, 294-95, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). For these reasons, we conclude that Appellees' suit is not barred under *Seminole Tribe* 's modification of *Ex Parte Young.*

IV.

*Implied Cause of Action*

Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, prohibits any recipient of federal financial assistance from discriminating on the basis of race, color, or national origin in any federally funded program.[16] The Supreme Court has recognized an implied *private* cause of action to enforce Section 601. *See Alexander v. Choate,* 469 U.S. 287, 293-94, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); *Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 607 n. 27, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); *id.* at 608 n. 1, 103 S.Ct. 3221 (Powell, J., concurring in judgment). To state a Section 601 claim, just like a claim arising under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must establish the funding recipient's discriminatory intent. *See Alexander,* 469 U.S. at 293, 105 S.Ct. 712; *see also United*

---

[16]Section 601 of Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Civil Rights Act of 1964 § 601, 42 U.S.C. § 2000d.

*States v. Fordice,* 505 U.S. 717, 732 n. 7, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992); *Elston,* 997 F.2d at 1405

n. 11, 1406; *Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403, 1417 (11th

Cir.1985).

Section 602 of Title VI expressly authorizes federal agencies to promulgate rules and regulations to

effectuate the provisions of Title VI.[17] The Supreme Court has held that agencies have the authority to

promulgate regulations under Section 602 that prohibit funding recipients from taking any action that *results*

in a disparate impact or produces discriminatory *effects* on the basis of race, color, or national origin. *See*

*Guardians,* 463 U.S. at 584 n. 2, 103 S.Ct. 3221 (White, J.); *id.* at 623 n. 15, 103 S.Ct. 3221 (Marshall, J.);

*id.* at 642-45, 103 S.Ct. 3221 (Stevens, Brennan, Blackmun, JJ.); *see also Alexander,* 469 U.S. at 293, 105

---

[17]Section 602 of Title VI provides:

> Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of Section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

Civil Rights Act of 1964 § 602, 42 U.S.C. § 2000d-1.

S.Ct. 712; *Lau,* 414 U.S. at 568, 94 S.Ct. 786; *id.* at 571, 94 S.Ct. 786 (Stewart, J., concurring). Here, the parties concede that the Department of Public Safety is subject to such regulations through monies it receives both from the Department of Transportation and the Department of Justice. The relevant regulations state:

> A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of persons to whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such program, or the class of persons to be afforded an opportunity to participate in any such program; *may not, directly or through contractual or other arrangements, utilize criteria or other methods of administration which have the effect of subjecting persons to discrimination because of their race, color, or national origin,* or have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, or national origin.[18]

49 C.F.R. § 21.5(b)(2) (Department of Transportation) (emphasis added); 28 C.F.R. § 42.104(b)(2) (Department of Justice) (same).

The central issue presented then is whether Appellees may enforce these agency regulations against Director Hagan and the Department, absent any express statutory authorization. In other words, we must determine whether there is an implied private cause of action to enforce agency regulations promulgated under Section 602 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-1. Appellants contend that the district court erred in holding that a private cause of action exists. We disagree. Our court has repeatedly recognized an implied private cause of action under Title VI to enforce the disparate impact regulations promulgated pursuant to Section 602. *See Burton v. City of Belle Glade,* 178 F.3d 1175, 1202-03 (11th Cir.1999); *Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1407 (11th Cir.1993); *Georgia State Conference of Branches of NAACP,* 775 F.2d 1403, 1417 (11th Cir.1985). Moreover, our circuit precedent is reinforced both by Supreme Court case law and the uniform position taken by our sister circuits.

---

[18]"Services, financial aid, or other benefits provided under a program receiving Federal assistance [is defined as] ... any service, financial aid, or other benefit provided in or through a facility provided with the aid of Federal financial assistance." 49 C.F.R. § 21.5(b)(4) (Department of Transportation); 28 C.F.R. § 42.102 (Department of Justice) (same).

We have recognized an implied private cause of action to enforce disparate impact regulations arising under Title VI three times. Appellants argue that our caselaw merely assumes *arguendo* that such a cause of action exists under Title VI. We disagree. First, in *Georgia State Conference of Branches of NAACP,* thirty-five black schoolchildren sued the Georgia State Board of Education alleging, among other things, that black students were assigned to programs for the mentally retarded in a racially discriminatory manner in violation of the Thirteenth Amendment, the Fourteenth Amendment, *and* Title VI and its implementing regulations. *See Georgia State,* 775 F.2d at 1407-08. The case was tried without a jury and the district court entered judgment for the defendants on the constitutional and Title VI claims. *See id.* at 1408. On appeal, we considered whether the district court properly applied "disparate impact tests" in evaluating the plaintiffs' Title VI claim. *Id.* at 1416. The defendants, relying on *Castaneda v. Pickard,* 648 F.2d 989 (5th Cir. Unit A 1981), argued that Title VI's nondiscrimination provisions were coextensive with the Fourteenth Amendment, and required a showing of discriminatory intent for *all* private suits. In short, they claimed that disparate impact *alone* could not support a finding of Title VI liability. Applying Supreme Court precedent in *Guardians* and *Alexander,* we squarely rejected that theory. In so doing, we observed that *Castaneda* no longer was good law on this point because a plurality of Justices in *Guardians* had endorsed the viability of a Title VI disparate impact suit based on administrative agency regulations. *Georgia State,* 775 F.2d at 1417 (finding that "five Justices [in *Guardians* ] were of the opinion that the regulations promulgated under Title VI permit the filing of suits alleging a disparate impact theory"). We concluded, "[t]here is no doubt that the plaintiffs predicated this cause of action on the [agency] regulations. As a result, the district court correctly applied the disparate *impact* analyses to their Title VI claims." *Id.* We then turned to the merits of the disparate impact analyses and concluded that the district court's findings as to the educational soundness of the defendants' practices were not clearly erroneous. *See id.* at 1419. In *Georgia State,* we therefore plainly recognized that private plaintiffs may sue to enforce disparate impact regulations arising under Title VI without a showing of discriminatory intent as required by Section 601 of Title VI.

**26**

Then, in *Elston v. Talladega County Board of Education,* we reiterated this point. There, we considered again a *private* claim brought by a class of black students and their parents against the Talladega County Board of Education alleging that the board's efforts at restructuring its school system violated the First and Fourteenth Amendments, Title VI and its implementing regulations, and Alabama Code § 36-12-40. *See Elston,* 997 F.2d at 1400. Applying disparate *impact* analyses, the district court held, among other things, that because the board's actions did not have any discriminatory effect on blacks, the plaintiffs had failed to demonstrate a violation of the Title VI regulations. *See id.* at 1404. On appeal, we assumed *arguendo* that the plaintiffs maintained a proper cause of action based on the disparate impact agency regulations, and we affirmed the judgment of the district court. *See id.* at 1406-07.

Most recently, in *Burton v. City of Belle Glade,* we unambiguously recognized that the black tenants of a housing project could maintain an implied cause of action to enforce the disparate impact regulations promulgated by the Department of Agriculture pursuant to Section 602 of Title VI. *See Belle Glade,* 178 F.3d at 1202-03. Although we remanded the case to the district court for further proceedings, we reaffirmed the validity of an implied *private* cause of action under Section 602. *See id.* (observing that "we have recognized an implied private right of action to enforce the regulations promulgated under section 602 of Title VI"). In short, our precedent has unambiguously recognized an implied cause of action to enforce disparate impact regulations promulgated pursuant to Section 602 of Title VI.

Moreover, this view is the consistent position of at least eight other courts of appeals. Without detailed discussion, seven of our sister circuits have indicated that an implied *private* cause of action exists under Section 602. *See Buchanan v. City of Bolivar, Tenn.,* 99 F.3d 1352, 1356 n. 5 (6th Cir.1996) (citing *Guardians* for the proposition that "a [private] plaintiff may pursue a claim under a disparate impact theory" pursuant to Section 602 of Title VI) (citation omitted); *Villanueva v. Carere,* 85 F.3d 481, 486 (10th Cir.1996) (noting "[a]lthough Title VI itself proscribes only intentional discrimination, certain regulations promulgated pursuant to Title VI prohibit actions that have a disparate impact on groups protected by the act,

**27**

even in the absence of discriminatory intent") (citation omitted); *New York Urban League, Inc. v. New York,* 71 F.3d 1031, 1036 (2d Cir.1995) (stating that "a plaintiff alleging a violation of the DOT regulations [under Section 602 of Title VI] must make a prima facie showing that the alleged conduct has a disparate impact") (citations omitted); *David K. v. Lane,* 839 F.2d 1265, 1274 (7th Cir.1988) (declaring "[i]t is clear that plaintiffs may maintain a private cause of action to enforce the regulations promulgated under Title VI of the Civil Rights Act. Moreover, plaintiffs need not show intentional discriminatory conduct to prevail on a claim brought under these administrative regulations.") (citation omitted); *Castaneda by Castaneda v. Pickard,* 781 F.2d 456, 465 n. 11 (5th Cir.1986) (explaining that "a Title VI action can now be maintained in either the guise of a disparate treatment case, where proof of discriminatory motive is critical, or in the guise of a disparate impact case.... In this latter type of case, proof of discriminatory intent is not necessary.") (citation omitted); *Latinos Unidos De Chelsea v. Secretary of Hous. & Dev.,* 799 F.2d 774, 785 n. 20 (1st Cir.1986) (noting "under the statute itself, plaintiffs must make a showing of discriminatory intent; under the regulations, plaintiffs simply must show a discriminatory impact") (citation omitted); *Larry P. by Lucille P. v. Riles,* 793 F.2d 969, 981-82 (9th Cir.1984) (finding that "proof of discriminatory effect suffices to establish liability when the suit is brought to enforce regulations issued pursuant to the statute rather than the statute itself") (footnote omitted).

The only other circuit to have addressed the issue in detail also concluded that an implied private cause of action exists under Section 602 of Title VI. *See Chester Residents Concerned for Quality Living v. Seif,* 132 F.3d 925, 936-37 (3d Cir.1997), *vacated as moot,* --- U.S. ----, 119 S.Ct. 22, 141 L.Ed.2d 783 (1998). In *Seif,* the Third Circuit read Supreme Court precedent in *Guardians* and *Alexander* to strongly suggest that an implied private cause of action exists under Section 602. *See id.* at 929-31. The *Seif* court then determined that an implied private right of action was supported both by Title VI's legislative scheme and legislative history. *See id.* at 933-36.

**28**

Moreover, our own independent review of Supreme Court case law confirms the view that Title VI creates a private implied cause of action to enforce the disparate impact regulations promulgated under Section 602. Although the Court has yet to squarely answer the question before us, we believe that a close reading of *Lau, Guardians,* and *Alexander* necessarily establishes several holdings logically supporting an implied private cause of action under Section 602 of Title VI. To begin, in *Lau,* the Supreme Court held that HEW regulations—promulgated pursuant to Section 602 and establishing a disparate impact standard under Title VI—were valid interpretations of Title VI's substantive contours. *See Lau,* 414 U.S. at 568, 94 S.Ct. 786 (finding that HEW regulations authorized a Title VI disparate impact claim under Section 601); *id.* at 571, 94 S.Ct. 786 (Stewart, J., concurring). As explained earlier, *Lau* relied on these agency regulations to recognize a *private* plaintiff disparate impact suit under Title VI against a local school district that received federal funds while enforcing a policy of not providing supplemental language instruction to non-English proficient Asian students. *See id.* at 566-68, 94 S.Ct. 786. The HEW regulations relied on in *Lau* are substantially similar to the Department of Transportation and Department of Justice regulations of the instant case.[19] Furthermore, the *Lau* Court also held that these disparate impact regulations did not exceed the statutory authority of Title VI because they " 'reasonably related' " to the statute's antidiscrimination purposes. *See id.* at 571, 94 S.Ct. 786 (Stewart, J., concurring) (citation omitted). Although *Lau* rested its holding under Section 601 of Title VI, its outcome and reasoning clearly were based on the conclusion that agency regulations promulgated under Section 602 could create a disparate impact standard of liability. *See id.* at 568, 94 S.Ct. 786; *id.* at 571, 94 S.Ct. 786 (Stewart, J., concurring) (noting the "critical question is whether the [Section 602] regulations and guidelines promulgated by HEW go beyond the authority of Section 601").

---

[19]*Compare* 45 C.F.R. § 80.3(b)(1)(HEW), *with* 49 C.F.R. § 21.5(b)(2)(DOT), *and* 28 C.F.R. § 42.104(b)(2)(DOJ) (same).

Five Justices in *Guardians* reaffirmed this holding of *Lau.*[20] *Guardians* also involved a *private* suit by black and Hispanic police officers alleging, *inter alia,* that their department's lay-off policy violated Title VI. In a plurality opinion, five Justices endorsed the view that Section 602 implementing regulations could support declaratory or injunctive relief for private plaintiffs under Title VI. *See Alexander,* 469 U.S. at 293, 105 S.Ct. 712; *Guardians,* 463 U.S. at 584, 103 S.Ct. 3221 (White, J.); *id.* at 615, 103 S.Ct. 3221 (Marshall, J.); *id.* at 641-45, 103 S.Ct. 3221 (Stevens, Brennan, Blackmun, JJ.). While the Justices did not explicitly address whether an implied private right of action existed under Section 602, their analysis strongly supports recognizing such a right. All five of the plurality members would allow *private* plaintiffs to sue for injunctive or declaratory relief on the basis of Section 602 disparate impact regulations that prohibit recipients of federal funds from enforcing policies with discriminatory effects on protected minority groups. *See id.* at 584, 589-93, 103 S.Ct. 3221 (White, J.); *id.* at 615, 103 S.Ct. 3221 (Marshall, J.); *id.* at 641-45, 103 S.Ct. 3221 (Stevens, Brennan, Blackmun, JJ.). Moreover, the agency regulations supporting this private cause of action are promulgated under the authority of Section 602 of Title VI to "effectuate" the statute's purposes as outlined in Section 601. *See* 42 U.S.C. § 2000d-1.

Finally, this inference also draws support from the language of the plurality opinions. In announcing the decision, Justice White explained:

the threshold issue before the Court is *whether the private plaintiffs in this case need to prove discriminatory intent to establish a violation of Title VI of the Civil Rights Act of 1964, and*

---

[20]The *Lau* holding was indirectly questioned in *Bakke* where a majority of the Supreme Court joined a concurrence that read Title VI's provisions as co-extensive with the Fourteenth Amendment. *See Regents of the Univ. of Ca. v. Bakke,* 438 U.S. 265, 325, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (noting that "Title VI goes no further in prohibiting the use of race than the Equal Protection Clause"). One year earlier, the Supreme Court in *Arlington Heights* had reaffirmed the *Washington v. Davis* holding that equal protection violations of the Fourteenth Amendment required a showing of discriminatory intent. *See Village of Arlington Heights v. Metro. Housing. Dev. Corp.,* 429 U.S. 252, 264, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (citing *Washington v. Davis,* 426 U.S. 229, 242-44, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). *Lau* 's recognition of a disparate impact theory of liability under Title VI implementing regulations seemed at odds with this *Bakke* dicta. *Guardians* settled this question by reaffirming that, when based on federal agency regulations promulgated under Section 602 authority, a disparate impact cause of action for declaratory and injunctive relief by private plaintiffs could be maintained.

> *administrative implementing regulations promulgated thereunder.* I conclude, as do four other Justices, in separate opinions, that the Court of Appeals erred in requiring proof of discriminatory intent. However, I conclude that the judgment below should be affirmed on other grounds, because, in the absence of discriminatory animus, compensatory relief should not be awarded to *private* Title VI plaintiffs; unless discriminatory intent is shown, declaratory and limited injunctive relief should be the only available *private* remedies for Title VI violations.

*Id.* at 584, 103 S.Ct. 3221 (emphasis added). Justice White's crucial fifth vote unambiguously contemplated the right of *private* plaintiffs to obtain injunctive and declaratory relief under disparate impact agency regulations promulgated under the authority of Section 602. The opinions of the four other plurality members also support a similar interpretation. Writing for himself, Justice Marshall explained that he would reaffirm *Lau* in full and allow private parties the right to sue under Title VI for disparate impact claims. *See id.* at 623-24, 103 S.Ct. 3221. The three other plurality members also indicated support for a *private* party suit to enforce Section 602 agency regulations prohibiting disparate impact violations—albeit on different grounds. They reasoned that the Section 602 disparate impact regulations constitute "valid federal law" and that private parties may sue under Section 1983 to obtain both injunctive and compensatory relief for violations of the regulations' terms. *See id.* at 645, 103 S.Ct. 3221 (Stevens, Brennan, Blackmun, JJ.). In *Guardians,* the plaintiffs sued under Section 1983 to enforce Title VI and did not base their cause of action on Section 602 alone.[21] Justice Stevens' opinion omitted a discussion of whether an implied cause of action exists under Section 602 regulations, noting in a footnote that the issue was not presented directly before them. *See id.* at 645 n. 18, 103 S.Ct. 3221. However, despite this caveat, his opinion endorsed all of the analytical predicates necessary for recognizing an implied private cause of action under Section 602. It agreed that (1) disparate impact regulations, (2) promulgated under Section 602 authority, (3) represent valid federal law (4) consonant with Title VI's legislative scheme (5) and legislative history, and (6) may be enforced by *private*

---

[21]In this case, plaintiffs relied on Section 602 directly rather than basing their cause of action on Section 1983.

parties (7) to obtain declaratory, injunctive, or compensatory relief. *See id.* at 641-45, 103 S.Ct. 3221.[22] We therefore read *Guardians* to suggest strongly the existence of an implied private cause of action under Section 602.[23]

---

[22]These findings prompted the conclusion:

> [We] would hold that a court has broad discretion to remedy violations of Title VI in actions brought by private parties ... [b]ecause the relief petitioners received was available to them under Title VI, and because that relief was justified without proof of discriminatory intent.... [Although] the petitioners had to prove that respondents' actions were motivated by an invidious intent in order to prove a violation of the statute, they only had to show that the respondents were producing discriminatory effects in order to prove a violation of valid federal law.

*Id.* at 645, 103 S.Ct. 3221 (Stevens, Brennan, Blackmun, JJ.)

[23]This conclusion also draws reinforcement from dicta in *Alexander.* In *Alexander,* a private party disparate impact suit brought under federal agency implementing regulations pursuant to Section 504 of the Rehabilitation Act of 1973, a unanimous Supreme Court offered a clarification of the *Guardians* holding.

> First, the Court held that Title VI itself directly reached only instances of intentional discrimination. Second, the Court held that actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI. In essence, then, we held that Title VI had delegated to the agencies in the first instance the complex determination of what sorts of disparate impacts upon minorities constituted sufficiently significant social problems, and were read enough remediable, to warrant altering the practices of the federal grantees that had produced those impacts.

*See Alexander,* 469 U.S. at 293-94, 105 S.Ct. 712. Moreover, in applying the *Guardians* holding to the facts of *Alexander,* the Court also explained that "to the extent our holding in *Guardians* is relevant to the interpretation of § 504, *Guardians* suggests that the regulations implementing § 504, upon which respondents in part rely, *could make actionable* the disparate impact challenged in this case." *Id.* at 294, 105 S.Ct. 712 (emphasis added). The opinion explained its hesitancy in applying *Guardians* directly to *Alexander* by distinguishing the legislative history and case law surrounding Title VI and Section 504. *See id.* at 295 & n. 11, 105 S.Ct. 712. Nevertheless, the treatment of *Guardians* in *Alexander* suggests that the *Guardians* plurality supported a private cause of action based on the implementing regulations. Any other conclusion would be inconsistent with the claim in *Alexander* that *Guardians* lends support for the notion that the implementing regulations of Section 504 could create a private disparate impact cause of action. Only if *Guardians* recognized or strongly supported an implied cause of action based on Title VI agency regulations would the decision lend support for finding an implied cause of action under agency regulations promulgated under a statute similar to Title VI.

**32**

In short, we read *Lau, Guardians,* and *Alexander, in pari materia,* to logically support finding an implied private cause of action under Section 602.[24] These cases establish three important holdings: (1) disparate impact regulations promulgated pursuant to Section 602 of Title VI constitute an authoritative construction of Title VI's antidiscrimination provisions; (2) private parties may enforce these regulations to obtain declaratory and injunctive relief; and (3) Title VI's legislative history and scheme unequivocally support an implied cause of action under Section 601 and Section 602. For these reasons, we conclude that an implied private cause of action exists under Section 602 of Title VI.

V.

*Disparate Impact on the Basis of National Origin*

Having determined that Appellees were not barred procedurally from bringing a Title VI suit against the Alabama Department of Public Safety, we address the merits of the case. Appellees' suit lies strictly under a disparate *impact* theory of liability. In prior cases, our circuit has applied explicitly Title VII's disparate impact framework to Title VI disparate impact suits. *See Elston,* 997 F.2d 1407 & n. 14; *Georgia State,* 775 F.2d at 1417.

Under the Title VI disparate impact framework, plaintiffs are required to prove "by a preponderance of the evidence that a facially neutral practice has a disproportionate adverse effect on a group protected by Title VI." *Elston,* 997 F.2d at 1407. Once a prima facie showing is made, a defendant must prove that a

---

[24]Appellants argue that the Supreme Court in *United States v. Fordice* overruled *Guardians* and *Lau* in a footnote of an opinion authored by Justice White, the crucial fifth vote for the *Guardians* plurality. The footnote states, "private petitioners reiterate in this Court their assertion that the state system also violates Title VI, citing a regulation to that statute which requires States to 'take affirmative action to overcome the effects of past discrimination.' Our cases makes clear, and the parties do not disagree, that the reach of Title VI's protection extends no further than the Fourteenth Amendment." *United States v. Fordice,* 505 U.S. 717, 732 n. 7, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992) (citations omitted). Although the footnote references agency regulations, the discrimination involved in *Fordice* centered on intentional discrimination in college education and not disparate impact discrimination. While not altogether clear, we believe the footnote merely confirms that a Title VI suit, based on the statute alone, must prove intentional discrimination similar to an Equal Protection claim. Nor are we persuaded that the Supreme Court would have overruled *Guardians* without *any* discussion of its precedent and in so oblique a manner as suggested by Appellants.

"substantial legitimate justification" exists for the challenged practice. *Id.* If a defendant meets this burden, a plaintiff still may prevail by demonstrating that a "comparably effective alternative practice which would result in less disproportionality" exists, or that the "defendant's proffered justification is a pretext for discrimination." *Id. See Georgia State,* 775 F.2d at 1417. We apply this framework to the district court's findings of fact and conclusions of law.

In a detailed order, the trial court marshaled an array of evidence to support its conclusion that the English-only driver's license exam policy, although a facially neutral classification, exerted a disparate impact on the basis of national origin. Appellants, in fact, do not contest any of the district court's findings of fact—either as to the disparate impact of the policy on non-English speaking license applicants or the pretextual nature of the policy justifications offered by the State. Instead, Appellants challenge only the district court's conclusions of law. Specifically, Appellants argue that an English language policy, even if exerting a disparate impact on the basis of national origin, cannot ever constitute national origin discrimination. We conclude otherwise.

The district court's findings of fact establish that the English language policy for driver's license exams has a statewide disparate impact on Alabama residents of foreign descent. To prove disparate impact, a plaintiff must demonstrate three essential elements: first, a facially neutral policy casts an effect on a statutorily-protected group; second, the effect is adverse; and finally, the effect is disproportionate. *See Elston,* 997 F.2d at 1407. The district court's factual findings satisfy each of these three elements. In the course of the bench trial, the district court heard substantial evidence relating to the history, implementation, and effect of Appellants' English-only exam policy. *Sandoval,* 7 F.Supp.2d at 1291-95. On the basis of this evidence, the court made three central findings. First, it concluded that as many as 13,000 Alabama residents cannot obtain driver's licenses as a result of the English-only test requirement. *See id.* at 1282. Appellants do not dispute that the inability to drive a car adversely affects individuals in the form of lost economic opportunities, social services, and other quality of life pursuits. Second, the district court found that of "all

**34**

[the] legal residents of the State of Alabama who are otherwise qualified to obtain a Class D private vehicle driver's license but cannot do so because they are not sufficiently fluent in English, *... [a] vast majority ... are from a country of origin other than the United States.*"[25]  *Sandoval,* 7 F.Supp.2d at 1283 (emphasis added). Third, the court determined that while no reasonable accommodations were made for non-English speaking applicants, other applicant groups, such as disabled and deaf drivers, received substantial assistance in taking the driving exam. *See id.* at 1287-90.  Notably, the Department also made special test accommodations for illiterate English speakers who, just like non-English speakers of foreign descent, cannot proficiently read highway signs in English.  The court also found that licensed drivers from other states and countries were able to obtain an Alabama driver's license without having to take the Department's written exam—irrespective of their fluency in the English language.  These factual findings demonstrate that Appellants' policy significantly impacts Alabama residents of foreign descent, in both an adverse and disproportionate manner.  On appeal, Appellants do not dispute the adverse, disparate impact their English-only policy visits on Alabama residents of foreign descent.

Nevertheless, Appellants contend, as a matter of law, that a discriminatory language policy cannot constitute a disparate impact based on national origin.  Their argument rests on a single premise:  language never has been held to be a proxy for national origin for purposes of proving intentional discrimination.  This argument is misplaced.  Appellees' Title VI claim does not require a showing of intentional discrimination on the part of Appellants.  Indeed, Appellees do not argue now that Appellants' driver's license policy masked discriminatory animus or acted as a proxy for such animus.  Appellees' Title VI claim does not implicate the Equal Protection Clause or Section 601 of Title VI, but instead concerns the disparate *impact* provisions of

---

[25]This result should not be surprising in light of statistics correlating language with national origin cited by the district court. *See Sandoval,* 7 F.Supp.2d at 1282.  Of those who speak Spanish in the United States, 97% are Hispanic. *See id.*  The court also cited the testimony of researcher of Edward Chen showing that "the correlation between language and national origin is also very high."  As of 1989, 72.5% of Chinese Americans speak a language other than English at home.  Comparable figures for other Asian Pacific Islander groups exists for Cambodians (81.9%), Vietnamese (80.7%), Laotians (77.4%), Thai (72.5%), Koreans (69.7%), Filipinos (59.9%), Indians (55.3%), and Japanese (40.5%). *See Sandoval,* 7 F.Supp.2d at 1282.

Section 602 of Title VI. While existent case law is unclear as to whether language may serve as a proxy for *intentional* national origin discrimination claims of either a constitutional or statutory nature,[26] this question is tangential to disparate *impact* analysis.

Our circuit unambiguously has held that disparate impact suits under Section 602 involve no intent requirement. *See Belle Glade,* 178 F.3d at 1201-03 (citing *Elston,* 997 F.2d at 1407; *Georgia State,* 775 F.2d at 1417); *cf. Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (explaining that Title VII disparate impact suits are directed at the "consequences of employment practices"). Under this cause of action, unlike a claim arising under Section 601, "a plaintiff may obtain injunctive or declaratory relief by showing, among other things, that the challenged action has a 'disparate impact on groups protected by the statute, even if those actions are not intentionally discriminatory.' " *Belle Glade,* 178 F.3d at 1202

[26]The Supreme Court never has held that language may serve as a proxy for national origin for equal protection analysis. However, in the context of jury selection, the Court surmised that "it may well be, for certain ethnic groups and in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis." *Hernandez v. New York,* 500 U.S. 352, 371-72, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). It also has observed the close nexus between language and national origin in other dicta. *See Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 92-93 & n. 5, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973) (noting that while there was no evidence of national origin discrimination, there also was "no suggestion, for example, that the company refused to hire aliens of Mexican or Spanish-speaking background while hiring those of other national origins"); *Farrington v. Tokushige,* 273 U.S. 284, 298, 47 S.Ct. 406, 71 L.Ed. 646 (1927) (observing that "the Constitution protects ... [the Japanese] as well as those who speak another tongue"). Our circuit also has reached this conclusion in dicta in two prior cases. *See United States v. Uvalde Consol.Indep.Sch. Dist.,* 625 F.2d 547, 553 (5th Cir.1980) (stating that "the Fourteenth Amendment clearly extends to protection of any group of persons invidiously discriminated against by state law including groups identifiable by ethnic, national origin, or *linguistic characteristics* ") (emphasis added); *Gloor,* 618 F.2d 264, 270 (5th Cir.1980) (noting that "to a person who speaks only one tongue or has difficulty using another language than the one spoken in his own home, language might well be an immutable characteristic like skin color, sex, or place of birth"). Several other federal circuits have drawn similar conclusions about the connection between language and national origin. *See Yniguez v. Arizonans for Official English,* 69 F.3d 920, 947-48 (9th Cir.1995), *vacated on other grounds,* 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (finding that "since language is a close and meaningful proxy for national origin, restrictions on the use of languages may mask discrimination against specific national origin groups, or more generally, conceal nativist sentiment"); *Carino v. University of Oklahoma Bd. of Regents,* 750 F.2d 815, 818-19 (10th Cir.1984) (finding that employment termination, because of foreign accent, constituted national origin discrimination); *Berke v. Ohio Dep't of Pub. Welfare,* 628 F.2d 980, 981 (6th Cir.1980) (per curiam) (determining that refusal to hire based on foreign accent amounted to Title VII discrimination on the basis of national origin). We refrain from reaching this question since this case does not involve either a statutory or constitutional claim concerning *intentional* discrimination.

(quoting *Elston,* 997 F.2d at 1406) (citing *Alexander,* 469 U.S. at 292-94, 105 S.Ct. 712; *Guardians,* 463 U.S. at 584 n. 2, 103 S.Ct. 3221; *Georgia State Conference,* 775 F.2d at 1417). Therefore, whether the English-only driver's license policy acted as a proxy for targeting residents of foreign descent is irrelevant under a Section 602 suit for injunctive relief. Plaintiffs instead must prove that the "facially neutral practice [of requiring English-only driving exams] has a disproportionate adverse effect on a group protected by Title VI [in this case, national origin]." *Elston,* 997 F.2d at 1407 (citing *Georgia State,* 775 F.2d at 1417).

In short, the district court properly applied our circuit's disparate impact standard, and concluded that Appellees had presented a prima facie case of disparate impact on the basis of national origin. Moreover, the district court determined that Appellants' stated justifications for the English-only policy were a pretext. Appellants do not contest this finding. Therefore, we can find no error in the district court's conclusion of law that the English-only policy evinces an unlawful disparate impact based on national origin.

Moreover, as discussed earlier, both Supreme Court precedent and longstanding congressional provisions and federal agency regulations have repeatedly instructed state entities for decades that a nexus exists between language and national origin. In *Lau,* a school district, that received federal funds, was adjudged liable under Title VI disparate impact regulations for an English language policy that adversely affected non-English-speaking Chinese students. *See Lau,* 414 U.S. at 567-68, 94 S.Ct. 786. In ordering the district to take "affirmative steps" to rectify the policy's effects on "national origin-minority group children," the Supreme Court explicitly struck down the policy as unlawful national origin discrimination under Title VI. *See id.* Shortly after *Lau,* Congress ratified the *Lau* holding in its Education Amendments of 1974. There, Congress explained:

> [T]he Federal government, as exemplified by Title VI of the Civil Rights Act of 1964, ... has a special and continuing obligation to ensure that States and local school districts take appropriate action to provide equal educational opportunities to children and youth of limited English proficiency.

20 U.S.C. § 7402(a)(15). The Department of Justice then issued Title VI implementing regulations for all executive agencies, requiring grant recipients to provide foreign language assistance,

**37**

> [w]here a significant number or proportion of the population eligible to be served or likely to be directly affected by a federally assisted program (e.g., affected by relocation) needs service or information in a language other than English in order effectively to be informed of or to participate in the program.... This requirement applies with regard to written material of the type which is ordinarily distributed to the public.

28 C.F.R. § 42.405(d)(1) (1976). Both the Departments of Education and Health and Human Services also have connected language and national origin. *See* 24 C.F.R. Part 100, App. B. at IV. L & M, V.D., VI.B. (Department of Education) (instructing federal fund recipients to accommodate students with limited English proficiency in order to avoid unlawful national origin discrimination under Title VI); 45 Fed. Reg. 82,972 (1980) (Office of Civil Rights of the Department of Health and Human Services) (concluding that grant recipients "have an obligation under Title VI to communicate effectively with persons of limited English proficiency"). Finally, since 1980, the Equal Employment Opportunity Commission has warned state entities that English-only rules constrain "opportunities on the basis of national origin" and that the implementation of such rules constitutes a prima facie case of national origin discrimination. 29 C.F.R. § 1606.7(a).[27] These agency regulations in concert with *Lau* reinforce the district court's conclusion of law that Appellants' English-only policy violates Title VI by creating an adverse, disproportionate impact on non-English speaking Alabama residents who wish to obtain a driver's license.

## VI.

In sum, we hold that Appellees' suit is not barred under the Eleventh Amendment, that Section 602 of Title VI creates an implied private cause of action to obtain injunctive and declaratory relief under federal regulations prohibiting disparate impact discrimination against statutorily protected groups, and that the district court did not err in deciding, on the merits, that the Appellants' English-only official policy constituted

---

[27]Because the Equal Employment Opportunity Commission is the administrative agency in charge of enforcing Title VII, its Title VII interpretations long have been accorded substantial deference. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 431, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (citing *Griggs,* 401 U.S. at 433-34, 91 S.Ct. 849). *But see Spun Steak,* 998 F.2d at 1488-1490 (rejecting the EEOC's English-only guideline). Our circuit has adopted Title VII case law in its Title VI disparate impact jurisprudence. *See Elston,* 997 F.2d at 1407 n. 14; *Georgia State,* 775 F.2d at 1417.

a disparate impact on the basis of national origin.  Accordingly, we AFFIRM the district court order granting injunctive relief to Appellees.

AFFIRMED.